## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| Aspire Commodities LP, Raiden Commodities, LP | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| GDF SUEZ Energy North America, Inc., Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, And Coleto Power, LP, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

## ASPIRE COMMODITIES L.P.'S AND RAIDEN COMMODITIES, L.P.'S COMPLAINT FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF

Aspire Commodities L.P. ("Aspire") and Raiden Commodities L.P. ("Raiden"), for their Complaint for Damages and Injunctive and Declaratory Relief against GDF SUEZ Energy North America, Inc., Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP (collectively "GDF Suez"), states:

## INTRODUCTION

GDF Suez intentionally withholds electricity generation during times of tight supply, for reasons not explained by rational notions of supply and demand, but to use its power in times of such tight supply to drive prices in the ERCOT Real Time market higher. GDF Suez then dumps its electricity at the artificially high price it created to make excessive, artificial profits not supported by genuine supply and demand.

GDF Suez's intentional withholding is also done to manipulate the price of electricity contracts on commodities markets, allowing GDF Suez to uniquely predict where the commodities markets will go on days of its intentional withholding, and allowing it a unique profit opportunity not available to the public.

GDF Suez's manipulation of the commodities market through its intentional withholding schemes violates the Commodities Exchange Act, which has caused damage to Aspire, Raiden and other similarly situated traders and damaged the general public by driving up electricity costs in Texas.

Aspire and Raiden are entitled to be compensated for the damages GDF Suez's intentional manipulation has caused them and GDF Suez's illegal actions should be permanently enjoined.

## SUMMARY

The Electric Reliability Council of Texas ("ERCOT") operates a Real-Time market for electricity that uses economic signals to manage the required balance between supply and demand in the Texas electricity grid.  When supply is tight, market prices for generators' electricity is high to incent more production.  When supply exceeds demand, prices are low.

When the market prices exceed a generator's marginal costs, the generator should be willing to generate energy and offer it to the grid at that price.  A generator who chooses not to generate when market prices exceed its marginal costs irrationally foregoes the opportunity to make a profit and thus acts contrary to self-interest.

GDF Suez often intentionally withholds energy generation, through multiple schemes, in circumstances of tight supply and when the market price exceeds its marginal costs, sometimes when they significantly exceed GDF Suez's marginal costs.  It does so with the specific intent to drive the market price higher and it has succeeded at doing so.

GDF Suez intentionally withholds generation, and foregoes the profit it could make by generating, because it believes that it can create a sufficiently high artificial price so that its gains by offering generation at the artificial price it created will exceed the foregone profit.

Separately, GDF Suez knows that the market price for electricity in ERCOT drives the prices for electricity contracts on commodities markets.  Thus, by intentionally withholding generation during times of tight supply and creating an artificially high ERCOT market price – at times only known to it – GDF Suez knows it will also create artificially high prices in commodities markets, which assures the value of its long positions on the commodities markets, allows GDF Suez to take long positions on the commodities markets knowing that prices will be high and/or otherwise presents advantageous hedging or speculation opportunities for GDF Suez. Its trading gains based on its manipulation of the ERCOT market price also explain its willingness not to generate electricity when the market price exceeds its marginal costs.

GDF Suez's withholding schemes allow GDF Suez to generate the certainty of profit for itself and at times of its choosing not known to the public.  But, its machinations cause energy prices within ERCOT to be higher than they would be without its manipulation, which cause ratepayers to pay higher electricity bills than they would in the absence of GDF Suez's manipulation.  Its actions also create artificial prices in the commodities markets, which cause uncertainty, volatility, higher prices, less liquidity and harm to traders like Aspire and Raiden.

GDF Suez should be ordered to compensate Aspire and Raiden for their losses and to stop its intentional manipulation of the commodities markets in violation of the CEA.

## JURISDICTION AND VENUE

Plaintiffs' claims arise under the CEA, 7 U.S.C. 1 *et. seq*. Thus, this Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 and it has ancillary jurisdiction pursuant to 28

3

U.S.C. §1367 over the included common law claims because they are so intertwined with Plaintiffs' claim under the CEA that they form part of the same case and controversy.

This Court is the proper venue for this claim pursuant to 28 U.S.C. § 1391 because the actions and schemes described herein, which violate the CEA, originate and are directed from GDF SUEZ Energy North America, Inc.'s office in Houston, Texas.

## FACTS

### The Basics of the ERCOT Markets

1.  ERCOT was the first independent system operator in the United States, created in 1996 to determine the dispatch of electricity within a designated geographic region.

2.  The Public Utility Commission of Texas ("PUCT") is ERCOT's main regulator.

3.  GDF SUEZ Energy North America, Inc. controls the electric generation within ERCOT of the following entities:  Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP.

4.  ERCOT operates two separate but related markets:  a Day-Ahead Market and a Real-Time Market.  Since electricity is a "real time" commodity, no physical electricity can be exchanged prior to the moment of production and consumption.  Hence the Day-Ahead Market is a forward market and the Real-Time Market is the physical market.  The two primary purposes for the Day-Ahead Market are (1) to provide a mechanism whereby market participants can reduce their exposure to real time price volatility and, in so doing, (2) to create a mechanism through which market participants are incentivized to provide the dispatcher with accurate information about their expected behavior in the Real Time market.  The more accurate the information the dispatcher receives prior to real time, the more reliable and cost effective will be the real time dispatch.

4

5.      ERCOT also allows "virtual trades," pursuant to which participants trade on differences between the Day Ahead market and the Real Time market.

6.      In theory the results of the Day Ahead market provide a forecast of what market participants and ERCOT believe will happen during the operating day, i.e. the following day. To the extent the results from the Day Ahead market are good approximations of actual conditions, then ERCOT will not be required to intervene in the market.  In contrast, to the extent that actual conditions are not consistent with the expectations and results of the Day Ahead market, then ERCOT, as the system operator, will be required to intervene in the market with the likely effect that prices will deviate between the markets.  Indeed, one commonly used measure for how well the wholesale market is working is the degree of price convergence between the Day Ahead and Real Time markets.

7.      At all times ERCOT must balance the supply of electricity with demand.  It must also ensure that the system reliably delivers electricity, within the limits of the transmission lines. ERCOT uses economic signals sent by the "market price" for electricity, called the Locational Marginal Price ("LMP") to both balance the system and maintain its reliability.  The LMP changes throughout the day, in five minute intervals, as real-time conditions of supply and demand (and other factors such as transmission congestion) change.  As a general matter, when supply is low relative to demand, the LMP is high to incent more generation.  When supply is low relative to demand, the LMP is low to incent less energy generation.

8.      Generators, like GDF Suez, offer energy to the ERCOT grid in price/quantity tandems.  They tell ERCOT the amount of energy they are willing to generate and sell at a particular price.  These are called offer curves, because generators are willing to offer more energy at higher LMP prices and less energy at lower LMP prices.  ERCOT takes the generator's

energy if it is offered at a price below the then-existing LMP.  For example, if a generator offers 30 MW at an LMP of $50 per MWh, ERCOT will dispatch the generator's energy only if the LMP is at or above $50 per MWh.

9.      A generator can thus effectively prevent dispatch of its energy by pricing it above the LMP.  If that generator's energy is needed, such as when supply is tight, ERCOT will increase the LMP to attract and capture the needed energy, offered only at that higher LMP.

10.     ERCOT has set a maximum LMP price of $5,000 per MWh, which is much higher than the LMP caps for other independent system operators.  In addition to balancing the supply and demand of electricity, because ERCOT is an Energy-Only market, the LMP also provides economic signals and incentives for investment in new generation resources.  That is, unlike most other independent system operators, ERCOT wants to provide generators a sufficient net return on their investment through the LMP so that generators are incented to invest in additional generation.

11.     ERCOT relies upon generators acting rationally in response to the market's economic signal in order to maintain system balance and reliability.  One such assumption is that generators will produce energy when the LMP exceeds their marginal costs of such production.  PUCT's substantive rules and the Texas Public Utilities Regulatory Act make withholding of energy a prohibited act if that generator has "market power."  *See* PURA § 39.157; P.U.C. Subst. R.25.503(g)(7).  The prices at which a generator offers energy to the grid may be evidence that the generator is withholding production.  According to PUCT, "prices offered by a generation entity with market power may be a factor in determining whether the entity has withheld production.  A generation entity with market power that prices its services substantially above its marginal cost may be found to be withholding production[.]"  P.U.C. Subst. R.25.504(d).

12.     PUCT has, however, stated, likely to ease its oversight functions or to provide smaller generators with greater net returns, that generators who control less than 5% of system-wide generation capacity do not have market power.  PUCT's rules thus holds that a generator with than 5% of system-wide generation capacity – a "small fish" – cannot affect LMP prices through its supply or withholding of energy and cannot abuse market power by such withholding.  *See* P.U.C. Subst. R.25.504(c).  Thus, PUCT does not attempt to regulate the generation machinations of such "small fish."  Within ERCOT "small fish" swim free of PUCT's oversight with regard to energy generation or withholding of energy generation, even intentional withholding of energy generation to artificially drive LMPs higher.  Potomac Economics, an agent of PUCT and its independent Market Monitor, summarized  PUCT's "small fish" rule, stating that according to PUCT "market participants controlling less than five percent of the capacity in ERCOT by definition do not possess ERCOT-wide market power under the PUCT rules.  Hence, these participants can submit very high-priced offers that, per the PUCT rule, will not be deemed to be an exercise of market power."

13.     GDF Suez controls just less than 5% of the electricity generation within ERCOT and therefore PUCT considers it a "small fish".  PUCT does not attempt to regulate GDF Suez's generation decisions.  It swims free.

14.     GDF Suez's freedom from PUCT's oversight has been memorialized in a "Voluntary Mitigation Plan" with PUCT.  As long as GDF Suez adheres to the terms of its plan, that plan "provides GDF SUEZ an absolute defense against an allegation pursuant to PURA § 39.157(a) and P.U.C. Subst. R.25.503(g)(7) of an abuse of market power through economic withholding[.]"

15.     PUCT's conclusion that generators controlling less than 5% of generation capacity within ERCOT cannot affect LMP prices through withholding energy production is simply wrong.   During times when there is barely sufficient supply to meet demand, the withdrawal of even a small amount of energy can cause LMPs to increase dramatically, even up to the $5,000 cap.

16.     Potomac Economics agrees that despite ERCOT's assumption that "small fish" lack economic power, "small fish," in reality, can exert power to affect LMP prices.  In its State of the Market Report for 2012, Potomac Economics recognized, "[a]lthough 5 percent of total ERCOT capacity may seem like a small amount, the potential market impacts of a market participant whose size is just under the 5 percent threshold choosing to exercise flexibility and offering a significant portion of their fleet at very high prices could be large."   Potomac Economics noted that "[t]here were 450 hours over [2011 and 2012] with less than 4,000 MW of surplus capacity . . . During these times a large 'small fish' would be pivotal and able through their offers to increase the market clearing price, potentially [driving it] as high as the system-wide offer cap."

17.     GDF Suez has done exactly that.  During times of tight supply, through different schemes, it intentionally withholds otherwise available generation to drive LMPs to artificially high levels, even to the $5,000 cap.

**GDF Suez's Economic Withholding Creates Artificially High Prices**

18.     One scheme that GDF Suez has employed is called "economic withholding." During times of tight supply and when the LMP already exceeds GDF Suez's marginal costs, GDF Suez will shift its offer curve upward, above the then-existing LMP.  By doing so, it

prevents its energy from being dispatched, removes its generation from an already tight supply and causes ERCOT to raise the LMP in order to gain additional generation.

19.     July 3, 2013, provides a good example of GDF Suez's economic withholding.

20.     Throughout the day on July 3rd, the data provided by ERCOT indicated that during the time period when demand was highest for the day, there would barely be enough supply to meet that demand.  In other words, ERCOT's data showed that scheduled/available generation would be just enough to cover its demand forecast.  The implication from this information was that if there were any disturbances for either forecasted generation or forecasted load, prices could quickly rise.

21.     In the face of this fragile/tight situation, GDF Suez responded by changing its offer curve upward at hour 1600.  Specifically, GDF Suez changed its offer curves by offering a substantial part of capacity of each plant at the offer cap price of $5,000.  From the perspective of the software ERCOT uses to dispatch the system, the effect of GDF Suez's change in the offer curve is to move lower priced generation to the upper end of the supply curve, i.e. a block of GDF Suez's available megawatts was moved from lower price to (near) the maximum price. The dispatch software - which has an objective of minimizing the total cost of production - responds by decreasing the output of these now high priced units of GDF Suez:  their generating facilities were ramped down by an aggregate of 769 MW.

22.     So, in the midst of a situation where supply may not be adequate to cover demand and LMP prices already exceeded GDF Suez's marginal costs, GDF Suez changed its offer curve and raised the price of its generation.  At the time, GDF Suez's action was only known to it and not to other market participants.  Consequently, other similar generation units can simply not foresee such a fundamental change in pricing, and are therefore unable to respond in a timely

manner.  Furthermore, ERCOT's prohibition on economic or physical withholding of energy by those with market power virtually assures that GDF Suez's strategy will be effective.  GDF Suez knows that when LMP exceeds marginal costs, other generators will be producing at their capacity.  Thus, there is not excessive capacity that can come on line quickly when GDF Suez shifts its offer curve and eliminates its production from the market.

23.     From public information provided by ERCOT 60 days after the fact, the effect of GDF Suez's actions can be identified for the GDF Suez generation units:

| Plant | MW sold in the DAM | Real Time Output as of 1545 | Real Time Output From 1600 – 1700 | Difference |
|---|---|---|---|---|
| Coleto | 650 | 650 | 449 | -201 |
| Hays | 592 | 607 | 515 | -92 |
| Midlothian | 1017 | 1070 | 855 | -215 |
| Wise | 672 | 655 | 394 | -261 |

24.     If a generator does not sell in the Real Time market the amount of energy it sold in the Day Ahead Market, the generator must purchase the shortfall at the Real Time prices.  On July 3, through the intentional ramping down of 769MW, GDF Suez intentionally created a short position for the company in the relevant time period since it did not generate the amount that it had contracted to sell in the Day-Ahead Market.  The company voluntarily created a short position for itself during the time period when it was most likely that prices would potentially reach their highest level for the day.  Moreover, the output from the plants was not unavailable during this time period; their generation had simply been re-priced. The Real-Time Market prices reflected the effect of this re-priced generation:

| Time period | Real Time Market Prices |
|---|---|
| 1555 | $66.71 |
| 1600 | $758.98 |
| 1605 | $265.82 |
| 1610 | $120.00 |
| 1615 | $61.10 |

25.     There is no rational explanation for GDF Suez's decision to voluntarily expose itself to a potential loss of over $3.5 million for each hour unless they stood to gain more than that amount through some other means.

26.     Starting at hour 17:00, GDF SUEZ returned the offer curves to their original values, and all plants were ramped back up to their original output levels.  The result was that Real-Time Market prices in ERCOT dropped substantially as shown in the following table:

| Time period | Real Time Market Prices |
|---|---|
| 1655 | $52.94 |
| 1700 | $41.07 |
| 1705 | $39.76 |

27.     GDF Suez did the same thing on July 23, 2013.  It changed its offer curves during the time period 15:00 – 16:45, by pricing a significant portion of each unit at $4,900/MWh instead of its marginal generation cost.  The result, again, was that significant megawatts (in total 1,076 MW) did not get dispatched at a time of tight supply. The immediate result at 15:00 was several high LMP prints, as ERCOT needed to call on quick-start units to compensate for the ramping down of the units of GDF Suez as shown below:

| Date/Time | Load (MW) | LMP ($/MWh) |
|---|---|---|
| 7/23/2013 14:45 | 61,374.00 | 44.28 |
| 7/23/2013 14:50 | 61,374.00 | 44.13 |
| 7/23/2013 14:55 | 61,588.00 | 49.20 |
| 7/23/2013 15:00 | 61,760.00 | 822.11 |
| 7/23/2013 15:05 | 61,992.00 | 826.40 |
| 7/23/2013 15:10 | 61,841.00 | 831.10 |
| 7/23/2013 15:15 | 62,059.00 | 62.59 |
| 7/23/2013 15:20 | 62,059.00 | 120.05 |
| 7/23/2013 15:25 | 62,372.00 | 66.24 |
| 7/23/2013 15:30 | 62,566.00 | 57.48 |
| 7/23/2013 15:35 | 62,650.00 | 46.88 |

| 7/23/2013 15:40 | 62,650.00 | 48.50 |
| 7/23/2013 15:45 | 62,682.00 | 48.97 |

28.     As on July 3, there was no rational economic reason for GDF Suez to change its offer curve, given that the LMP exceeded its marginal costs at the time it changed its offer curves, other than an intent to drive the LMPs to artificially high levels.

29.     The industry periodical, Platts Megawatt Daily, has identified GDF Suez's economic withholding and its effect on the LMP.  It found:

> A Platts analysis of generation offer curves over nine separate days [in the summer of 2013] shows that on each of these days, GDF Suez raised the price on about 564 to 1,332 MW of electricity, across ERCOT, to between $4,900 and $5,000/MWh, which is the system-wide offer cap.  These price hikes were during the late afternoon typically between 4 and 5 p.m. and lasted at least an hour.

> ***

> In the hour before the GDF Suez generators collectively hiked their prices to near the system-wide offer cap, system-wide real time clearing prices ranges between $42.69 and $107.96.

> In the periods during which between 564 and 1,332 MW of GDF Suez power was offered near the system-wide cap, system wide real-time clearing prices ranged between $45.52 and $4,900.

> One of those days was September 3, when real-time power prices across ERCOT rose from about $50/MWh to about $4,900/MWh, which ERCOT said occurred because a 609-MW plant tripped off-line at about 4:45 p.m.  But beginning at 4 p.m. and continuing to 5:45 p.m. on that date, GDF Suez raised the price on 564 MW of its generation to between $4,900 and $5,000/MWh.

> During the nine days when GDF Suez engaged in similar pricing, in the hour after these generators collectively returned their prices to near the market-clearing price, system-wide real time clearing prices ranged between $39.80 and $81.89.

30.     Potomac Economics, ERCOT's independent market monitor, has agreed that GDF Suez's re-pricing of its offer curve is "economic withholding" of its energy generation.

31. The above examples of GDF Suez's economic withholding are just that – examples of one scheme GDF Suez regularly employs to manipulate the LMPs in the ERCOT Real Time market.

### GDF Suez's Physical Withholding Creates Artificially High Prices

32. GDF Suez removes its generation units from the grid by designating them as either "OFF" or "EMR" to ERCOT. Either designation removes the unit from ERCOT's consideration of the available generation.

33. GDF Suez's use of the OFF or EMR designations is not related to any physical need to have its units removed from generation, but from an incentive to artificially limit the supply of electricity to the ERCOT system and artificially create scarcity in order to artificially drive the LMP up.

34. On October 1, 2013, GDF Suez physically withheld available energy. For reasons not connected to any physical outage, repairs or other legitimate reason, for either part of or the whole day, GDF Suez designated Hays Energy units 2 & 3 as EMR; it designated Midlothian 1 & 2 as OFF; it designated Midlothian unit 3 as OFF; and Midlothian unit 4 as EMR. The result was predictable. The artificial scarcity GDF Suez created drove the LMP up.

35. GDF Suez employed the same strategy on November 22, 2013. It designated Hays Energy units 2 & 3 as EMR and Midlothian 4 as OFF for no physical reason. Once again, the artificial scarcity GDF Suez created had its intended effect, the LMPs rose to artificially high levels.

36. Again, the above are mere example's GDF Suez's regular and repeated strategy of physical withholding of energy to create an artificially high LMPs.

**GDF Suez's Withholding Creates Artificially High Prices on Commodities Markets**

37.     It is common knowledge in the industry that the LMP prices of electricity in the ERCOT Real Time market affect the price of electricity contracts on commodities markets such as the InterContinentalExchange ("ICE").

38.     According to Potomac Economics, "prices in the real-time energy market are very important because they set the expectations for prices in the forward markets where most transactions take place.  Unless there are barriers preventing arbitrage of the prices between the spot and forward markets, the prices in the forward market should be directly related to the prices in the spot market."   Thus, GDF Suez has the ability to create artificial prices in commodities markets through its creation of artificially high prices in the ERCOT Real Time market.

39.     Aspire's reconstruction of the supply/demand curves, assuming GDF Suez did not engage in its artificial economic and physical withholding schemes, demonstrates that GDF Suez's economic and physical withholding of energy in the ERCOT market causes both the LMPs within ERCOT and the prices for related financial products traded on ICE to increase artificially.

40.     GDF Suez knows of this fact.  For example, one financial product traded on ICE is the balance-of-the-day average peak power price for various nodes in the ERCOT market.  GDF Suez's manipulation of LMPs within ERCOT causes the balance-of-the-day average peak power price to also increase.  This fact has again been observed by Platts.  It observed:

> On six of the nine days when GDF Suez raised its power prices for between 564 and 1,332 MW near the system-wide offer cap – either during the price hike or in the first hour of trading thereafter – balance-of-the-day average peak power prices for deals made on the IntercontinentalExchange rose by 7% to 104%.

41.    Aspire has also identified this effect.  For the exemplar days identified above on which GDF Suez engaged in either economic or physical withholding of energy, Aspire has re-constructed supply and demand curves.  The result of those re-constructed supply and demand curves shows that GDF Suez's withholding materially caused the balance-of-the-day average peak power prices to be higher than they would have been absent GDF Suez's withholding.

42.    GDF Suez knows its withholding will have the identified effect on the financial products traded on ICE and, indeed, intends that result.

43.    GDF Suez knows that Real Time LMP is part of virtual trades and thus it intends that its manipulation of the Real Time LMP will directly affect the values used in virtual trades.

44.    The times when GDF Suez will decide to artificially create scarcity through either economic or physical withholding of energy are known only to it.  Thus, the markets cannot anticipate its actions and cannot contemplate its manipulation when determining prices.  GDF Suez trades in the forward markets, including on ICE.  It thus has superior, material, non-public knowledge on which to base its trades.  Further, GDF Suez's manipulations assure that any long positions it takes on ICE are correct and it can take assured forward hedging actions on the commodities market not available to others.

45.    One reason GDF Suez is willing to forego the profit it can make selling energy in the ERCOT market at prices above its marginal costs is because it can make more elsewhere – namely, by trading with inside, superior knowledge on commodities markets like ICE.  As Platts noted, GDF Suez "by increasing real-time prices, may be able to increase overall profits if their gains in the closely linked financial markets, not operated by ERCOT, more than make up for losses from selling less capacity in the real-time market."  Or, as Potomac Economics stated, "Because forward prices will generally be highly correlated with spot prices, price increases in

the real-time energy market can also increase a supplier's profits in the bilateral energy market . . . the withholding firm's incremental profit due to higher price is greater than the lost profit from the foregone sales of its withheld capacity."

46.    In additional to the direct effect higher LMP prices have on the financial markets, the unpredictable nature of GDF Suez's actions create unforeseeable volatility in the financial markets, which separately increases prices in those markets.

### The Resulting Harm Caused by GDF Suez's Intentional Manipulation of ERCOT LMPs and the Commodities Markets

47.    GDF Suez's actions in the ERCOT market harm rate payers.  GDF Suez's actions artificially drive up the average cost of energy.  That artificial increase is then passed on to the consumer in the form of higher rates, which they should not have to pay.

48.    GDF Suez's intentional, knowing and reckless manipulation of the commodities markets has also damaged Aspire and Raiden and other similarly situated traders.

49.    As noted above, the commodities markets set prices based on the disclosed expected generation.  Traders then make decisions based on those prices and other information relevant to expected supply and demand.  Neither the market nor traders have the ability to consider GDF Suez's undisclosed intent and decision to economically or physically withhold otherwise available energy.  GDF Suez's manipulation of prices in the commodities markets, through its actions within ERCOT, create artificial and unpredictable prices on ICE and directly manipulate the values in virtual trades and thus makes Aspire's and Raiden's rational trades and predictions, based on the disclosed information, incorrect, causing Aspire and Raiden to lose money or make less money that they should have if there had been no illegal manipulation from GDF Suez.

50.    On July 23, 2013, October 1 and November 22, alone, through its reconstruction of supply and demand curves (based on information available to it from ERCOT), Aspire has calculated that GDF Suez's manipulation caused prices to be higher than they would have been had the illegal manipulation not have occurred.

51.    GDF Suez's artificial price caused Aspire to lose $526,000, $4,298,448 and $2,832,000 on July 23, October 1 and November 22, respectively, compared to its what its position in the market would have been had GDF Suez not engaged in any illegal conduct.  Over the last two years, Aspire estimates GDF Suez's manipulation has caused it to lose approximately $20 million.  Raiden has lost significant amounts making virtual trades a result of GDF Suez's manipulation of the LMP.  In addition to Aspire's and Raiden's quantifiable damages, they each have lost opportunities because they have stayed out of the market due to the unpredictable volatility GDF Suez's manipulation causes.

52.    While ERCOT might tolerate GDF Suez's exploitation of its "small fish" exception and GDF Suez's intentional manipulation of its LMP prices for GDF Suez's gain, GDF Suez's actions violate the Commodities Exchange Act.

### COUNT I:  VIOLATION OF THE CEA

53.    Aspire incorporates herein the allegations contained in paragraphs 1-52 of its Complaint.

54.    The CEA, 7 U.S.C. § 9(1), provides in relevant part:

It shall be unlawful for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after July 21, 2010.

55.     The CEA, 7 U.S.C. § 9(3), provides in relevant part:

In addition to the prohibition in paragraph (1), it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity.

56.     The CEA, 7 U.S.C. § 9(2) provides in relevant part:

It shall be unlawful for any person to make any false or misleading statement of a material fact to the Commission, including in any registration application or any report filed with the Commission under this chapter, or any other information relating to a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

57.     Through its withholding schemes described above, GDF Suez intentionally, knowingly, and recklessly has manipulated, and continues to manipulate, the price of electricity in the ERCOT market and has caused the prices in ERCOT's Real Time market to increase artificially (i.e. not in accord with legitimate forces of supply and demand).

58.     GDF Suez's knows and intends that its creation of artificially high prices in the ERCOT Real Time market for electricity has created and will create artificially high prices for electricity contracts in commodities markets, such as ICE and will directly manipulate the values in virtual trades.  And that is exactly what happened.

59.     Just as Potomac Economics explained, GDF Suez intentionally creates artificially high prices on ICE and directly manipulates the values in virtual trades so that it is able gain more on its trades than it loses by not selling energy within ERCOT at prices that exceed its marginal costs.  Those actions have violated and continue to violate 7 U.S.C. §§ 9(1) and (3).

60.     GDF Suez's statements of its expected generation within ERCOT on days where it intended to economically withhold generation did not disclose that intent or its intended and

known effect.  Thus, its statements regarding expected generation were knowingly or recklessly false or misleading or omitted material information which made its statements false or misleading.  GDF Suez's intentional, knowing or reckless dissemination of false and misleading information caused Aspire and Raiden damages because the markets and Aspire and Raiden made trading decisions based upon the false information GDF Suez disseminated.  GDF Suez's intentional or reckless dissemination of false and misleading information has violated and continues to violate 7 U.S.C. § 9(2).

61.     GDF Suez's manipulation of prices for electricity contracts in commodities markets such as ICE has caused Aspire to suffer more than $20 million in damages, as detailed above, by creating artificial prices for electricity contracts traded on ICE and has caused Raiden damages from its trades on ERCOT's virtuals markets.

### COUNT II:  CONSPIRACY AND AIDING AND ABETTING

62.     Aspire incorporates herein the allegations contained in paragraphs 1-61 of its Complaint.

63.     GDF SUEZ Energy North America, Inc., Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP have agreed and conspired and worked in concert, such that one is the agent of the other, to manipulate the LMP prices within ERCOT through the above-identified withholding schemes with the intent and effect of manipulating the prices for electricity contracts in commodities markets such as ICE in violation of 7 U.S.C. §§ (9)(1), (2) and (3).

64.     Each defendant is therefore liable for the others' actions and all defendants are liable for the damages they have caused Aspire and Raiden, as a result of their agreement and conspiracy, and their actions in furtherance thereof, to violate the CEA.

65.     Defendants Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP knew of GDF Suez Energy North America, Inc.'s intent to manipulate ICE and the ERCOT virtual markets through their economic and physical withholding of energy.  Indeed, the above entities' knowledge and intended cooperation was essential to the intent to manipulate those markets since they are the generation entities whose generation was artificially withheld. The market manipulation could not have been accomplished but for the above entities' knowledge, cooperation and participation in the manipulation schemes, specifically through their artificial withholding of generation.

66.     Separately and alternatively, GDF Suez Energy North America, Inc.'s intent to manipulate must be inferred to the above generation entities since GDF Suez Energy North America, Inc. controls their generation decisions.  The generation entities do not have a will regarding their generation separate from GDF Suez Energy North America, Inc.

67.     Accordingly, the above generation entities have also violated the CEA by aiding and abetting GDF SUEZ Energy North America, Inc.'s violation of the CEA by intentionally following GDF SUEZ Energy North America, Inc.'s instructions to economically and physically withhold energy to (a) to cause artificially high LMP prices; (b) to cause artificially high prices and hedging and speculation opportunities on commodities exchanges like ICE; and (c) to directly manipulate the values of ERCOT virtual trades.

68.     Defendants' concerted actions have caused Aspire and Raiden damages.

## COUNT III:  PERMANENT INJUNCTION

69.     Aspire incorporates herein the allegations contained in paragraphs 1-68 of its Complaint.

70.     GDF Suez has violated the CEA through the above identified economic and physical withholding schemes.

71.     GDF Suez's illegal conduct has caused Aspire and Raiden injuries for which there is no monetary relief; namely, GDF Suez's illegal manipulation has introduced volatility into the commodities markets so that on many occasions Aspire and Raiden cannot reasonably participate in those markets.  The opportunity cost in such instances cannot be quantified with any certainty. Therefore, Aspire and Raiden have suffered injury for which an action at law is inadequate and therefore Aspire has suffered from GDF Suez's illegal conduct and it will continue to suffer such harm unless GDF Suez's illegal manipulation in violation of the CEA is enjoined.  Thus, Aspire and Raiden have suffered irreparable harm.

72.     The CEA evidences a public policy against GDF Suez's manipulative schemes.

73.     The irreparable harm to Aspire and Raiden, and to the market generally, is greater if GDF Suez's manipulative schemes are allowed to continue than the harm to GDF Suez if its manipulative scheme is enjoined since GDF Suez will not suffer any legitimate harm from it being ordered to stop illegal conduct.

74.     Accordingly, the Court should permanently enjoin GDF Suez from economically withholding its generation, as described above, and from physically withholding its generation absent a legitimate reason for such physical withholding.

## COUNT IV:  DECLARATORY RELIEF

75.    Aspire incorporates herein the allegations contained in paragraphs 1-74 of its Complaint.

76.    An actual, substantial, and *bona fide* controversy exists, under 28 U.S.C. § 2201, between Aspire and the GDF Suez, of immediacy and reality, and which can be resolved by a declaration of the parties' rights.  Specifically, whether GDF Suez, through its economic and physical withholding schemes and its dissemination of false and misleading information, identified above, has violated 7 U.S.C. §§ 9(1), (2) and/or (3).

77.    The rights of the parties to this controversy can be finally determined by a declaratory judgment from this Court.  A declaratory judgment would serve the useful purpose of settling the controversy, in that such a judgment would eliminate further litigation by finally establishing the parties' rights.

78.    Accordingly, Aspire and Raiden request that the Court declare:

- That by its economic withholding of generation capacity as described above, with the intent to manipulate the price of electricity contracts in the commodities markets, GDF Suez has violated 7 U.S.C. §§ 9(1) and (3);

- That by its physical withholding of generation capacity as described above, with the intent to manipulate the price of electricity contracts in the commodities markets, GDF Suez has violated 7 U.S.C. §§ 9(1) and (3);

- That by its dissemination of false and misleading information regarding its expected generation GDF Suez has violated 7 U.S.C. §§ 9(2);

- That GDF Suez's illegal actions have caused Aspire damages;

- That GDF Suez should be permanently enjoined from disseminating false information regarding its generation and from manipulating the price of electricity contracts in the commodities markets.

## JURY REQUEST

79.    Plaintiffs request a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Aspire Commodities, LP and Raiden Commodities, LP, request that the Court enter judgment in their favor on all issues raised in this Complaint, for damages sufficient to compensate them for their losses, for twice their damages as statutory damages because Defendants' illegal conduct was intentional and wilful, for the declaratory relief requested above, and for an permanent injunction ordering GDF Suez to cease its economic and physical withholding of generation and to cease its dissemination of false and misleading information regarding its expected generation, and for all other just and proper relief.

Respectfully submitted,

PATEL HAMMOND PLLC

/s/ Barrington M. Hammond, Jr.
Barrington M. Hammond, Jr.
Texas Bar No. 24059883
Federal ID No. 1338567
4801 Woodway Drive
Suite 300 East
Houston, Texas 77056
Phone:  (713) 570-6000
Fax:  (832) 514- 7046
Email: barry@patelhammond.com

Of Counsel

T. Joseph Wendt
Indiana Bar No. 19622-49
Barnes & Thornburg LLP
11 S. Meridian
Indianapolis, IN 46204
Phone:  (317) 231-7748
Fax:  (317) 231-7422
Email:  jwendt@btlaw.com