# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| Aspire Commodities L.P. and Raiden Commodities L.P., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 4:14-cv-01111 |
| GDF SUEZ Energy North America, Inc.; Ennis Power Company, LLC; Wise County Power Company, LLC; Midlothian Energy, LLC; Hays Energy, LLC; Wharton County Generation, LLC; and Coleto Power, LP, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND BRIEF IN SUPPORT

BRACEWELL & GIULIANI LLP
Stephen B. Crain
Attorney-In-Charge
State Bar No. 04994580
Federal Bar No. 12499
stephen.crain@bgllp.com

Tony L. Visage
State Bar No. 00788587
Federal Bar No. 17248
tony.visage@bgllp.com

Amy E. Parker
State Bar No. 24051156
Federal Bar No. 626178
amy.parker@bgllp.com

J. Erick Sandlin
State Bar No. 24056265
Federal Bar No. 872070
erick.sandlin@bgllp.com

Leslie D. Wilson
State Bar No. 24084109
Federal Bar No. 1708460
leslie.wilson@bgllp.com

711 Louisiana Street, Suite 2300
Houston, Texas 77002-2781
(713) 223-2300 Telephone
(713) 221-1212 Facsimile

COUNSEL FOR DEFENDANTS GDF
SUEZ ENERGY NORTH AMERICA,
INC.; ENNIS POWER COMPANY, LLC;
WISE COUNTY POWER COMPANY,
LLC; MIDLOTHIAN ENERGY, LLC;
HAYS ENERGY, LLC; WHARTON
COUNTY GENERATION, LLC; AND
COLETO POWER, LP

## <u>TABLE OF CONTENTS</u>

I.        INTRODUCTION .................................................................................1

      A.     PLAINTIFFS' FIRST AMENDED COMPLAINT ADDS LENGTH BUT NOT DEPTH TO THEIR CLAIMS AND CAUSES OF ACTION .......................1

      B.     PLAINTIFFS KNOW THE RULES; THEY DON'T LIKE THE RULES.............3

II.      STATEMENT OF ISSUES ...................................................................4

III.     NATURE AND STAGE OF PROCEEDING .........................................6

IV.     STANDARDS APPLICABLE TO RULE 12 MOTIONS .....................6

V.      MOTION TO DISMISS .......................................................................7

      A.     THERE IS NO PRIVATE RIGHT OF ACTION THAT PLAINTIFFS CAN PURSUE UNDER THE COMMODITY EXCHANGE ACT ......................8

      B.     PLAINTIFFS LACK STANDING..................................................................13

           1.     Plaintiffs Lack Standing to Pursue a Private Right of Action ..................13

           2.     Plaintiffs Lack Standing to Seek Injunctive Relief...................................13

           3.     Plaintiffs Lack Standing to Seek Declaratory Relief ................................14

      C.     THE "FILED RATE DOCTRINE" BARS PLAINTIFFS' CLAIMS ..................15

      D.     PLAINTIFFS FAIL TO MEET THE "INTERSTATE COMMERCE" JURISDICTIONAL REQUIREMENT OF THE CEA...........................................17

      E.     PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED................................................................................19

           1.     Plaintiffs Fail to Meet the Heightened Pleading Standard Required to State a CEA Claim Sounding in Fraud ....................................................19

           2.     Plaintiffs Fail to Plead Specific Intent .......................................................22

                 a.     Motive and Opportunity.................................................................23

                 b.     Conscious Misbehavior or Recklessness .......................................29

            3.     Allegations that GDF SUEZ Traded on Nonpublic Information Do Not Constitute a Violation of the CEA .......................................................30

4.      Plaintiffs Fail to Establish an Artificial Price Necessary to State a
        Claim under CEA Section 22(a)(1)(D)(ii) ..................................................32

5.      Plaintiffs Fail to Establish Aider and Abettor Liability under the
        CEA..............................................................................................................33

VI.     CONCLUSION AND PRAYER FOR RELIEF ....................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amacker v. Renaissance Asset Mgmt. LLC,*
    657 F.3d 252 (5th Cir. 2011) ................................................................................34, 35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).........................................................................................7, 24

*Bosco v. Serhant,*
    836 F.2d 271 (7th Cir. 1987) ...........................................................................34

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,*
    497 F.3d 546 (5th Cir. 2007) ...........................................................................28

*CFTC v. Enron Corp.,*
    No. H-03-909, 2004 WL 594752 (S.D. Tex. Mar. 10, 2004) ................................20

*CFTC v. Johnson,*
    408 F. Supp. 2d 259 (S.D. Tex. 2005) ...............................................................20

*CFTC v. Wilson,*
    ---F. Supp. 2d---, No. 13 Civ. 7884(AT), 2014 WL 2884680 (S.D.N.Y. June 26,
    2014) ........................................................................................................20

*Chadbourne & Parke LLP v. Troice,*
    134 S. Ct. 1058 (2014)....................................................................................19

*Chill v. Gen. Elec. Co.,*
    101 F.3d 263 (2d Cir. 1996)..............................................................................23

*Dawes v. Imperial Sugar Co.,*
    975 F. Supp. 2d 666 (S.D. Tex. 2013) ...............................................................28

*Decker v. Massey–Ferguson, Ltd.,*
    681 F.2d 111 (2d Cir.1982)..............................................................................24

*E & J Gallo Winery v. EnCana Corp.,*
    503 F.3d 1027 (9th Cir. 2007) ..........................................................................15

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976)........................................................................................23

*Gammel v. Hewlett-Packard Co.,*
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ..............................................................28

*Grynberg v. BP P.L.C.*,
   855 F. Supp. 2d 625 (S.D. Tex. 2012) ...................................................................7

*Hershey v. Energy Partners, L.P.*,
   610 F.3d 239 (5th Cir. 2010) ................................................................20, 23, 29, 32

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) .............................................................................28

*In re Amaranth Nat. Gas Commodities Litig.*,
   587 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) ("*Amaranth I*") ...........................13, 20, 23, 29, 30

*In re Amaranth Natural Gas Commodities Litig.*,
   612 F. Supp. 2d 376 (S.D.N.Y. 2009) ("*Amaranth II*") ........................................23

*In re Amaranth Natural Gas Commodities Litig.*,
   730 F.3d 170 (2d. Cir. 2013) ("*Amaranth III*") ....................................................34

*In re ArthroCare Corp. Sec. Litig.*,
   No. A-08-CA-574-SS, 2010 WL 2901536 (W.D. Tex. July 20, 2010) ....................27

*In re Cannon*,
   230 B.R. 546 (Bankr. W.D. Tenn. 1999), *rev'd on other grounds*, *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, NO. 99-2605 G/A, 2000 WL 34400479 (W.D. Tenn. Mar. 31, 2000)...........................................................................................14

*In re Commodity Exch. Inc. Silver Futures and Options Trading Litig.*,
   560 F. App'x 84 (2d Cir. 2014).................................................................24, 26, 33

*In re Crude Oil Commodity Litig.*,
   *No. 06-Civ-6677(NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)*............20, 21

In re Energy Transfer Partners Natural Gas Litig.,
   No 4:07-cv-3349, 2009 WL 2633781 (S.D. Tex. Aug. 26, 2009) .............20, 32, 33

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   --- F. Supp. 2d ---, No. 11 MD 2262(NRB), 2014 WL 2815645 (S.D.N.Y June 24, 2014) ("*LIBOR III*")..........................................................20, 22, 25, 29, 30

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("*LIBOR II*") ........................................14, 23

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*,
   537 F.3d 527 (5th Cir. 2008) .............................................................................28

*Jones v. Alexander*,
   609 F.2d 778 (5th Cir. 1980) .............................................................................15

*Jones v. United States.*,
    529 U.S. 848 (2000)................................................................................18

*Keogh v. Chi. & N. W. Ry. Co.*,
    260 U.S. 156 (1922)................................................................................16

*Ladd v. Colonial Sav., F.A.*,
    No. 3:13-CV-1817-P, 2014 WL 1393038 (N.D. Tex. Apr. 10, 2014)...................15

*Madonna v. United States*,
    878 F.2d 62 (2d Cir. 1989)........................................................................24

*Marcus v. AT&T Corp.*,
    138 F.3d 46 (2d Cir. 1988)....................................................................16, 17

*Merrill Lynch Futures Inc. v. Kelly*,
    No. 84 Civ. 2406-CSH, 1984 WL 217 (S.D.N.Y. Apr. 19, 1984)...........................14

*MLSMK Invs. Co. v. JP Morgan Chase & Co.*,
    737 F. Supp. 2d 137 (S.D.N.Y. 2010)...........................................................27

*Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*,
    341 U.S. 246 (1951)................................................................................17

*Ramming v. United States*,
    281 F.3d 158 (5th Cir. 2001) ......................................................................7

*Ret. Sys. and Local 295/Local 851 v. Boeing Co.*,
    711 F.3d 754 (7th Cir. 2013) ....................................................................29

*Roger J. Wright*,
    Comm. Fut. L. Rep. (CCH) ¶ 29412, n.213 (Feb. 25, 2003), CFTC No. 97-2, 2003
    WL 548760 ..........................................................................................18

*Rombach v. Chang*,
    *355 F.3d 164 (2d Cir. 2004)* ....................................................................20

*Sherman v. Sokoloff*,
    570 F. Supp. 1266 (S.D.N.Y. 1983)..............................................................27

*Taffet v. S. Co.*,
    967 F.2d 1483 (11th Cir. 1992) (en banc) ......................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    127 S. Ct. 2499 (2007)............................................................................23

*Tex. Commercial Energy v. TXU Energy, Inc.*,
    413 F.3d 503 (5th Cir. 2005) ............................................................16, 17, 18

*Tex. Commercial Energy v. TXU Energy, Inc.*,
  No. C-03-249, 2004 WL 1777597 (S.D. Tex. June 24, 2004)................................................18

*United States ex rel. Grubbs v. Kanneganti*,
  565 F.3d 180 (5th Cir. 2009) ........................................................................................22, 24

*United States ex rel. Steury v. Cardinal Health, Inc.*,
  735 F.3d 202 (5th Cir. 2013) ...............................................................................................22

*United States ex rel. Williams v. Bell Helicopter Textron Inc.*,
  417 F.3d 450 (5th Cir. 2005) ...............................................................................................27

*United States v. O'Hagan*,
  521 U.S. 642 (1997) . No ....................................................................................................31

*United States v. Radley*,
  659 F. Supp. 2d 803 (S.D. Tex. 2009), *aff'd on other grounds*, 632 F.3d 177 (5th Cir.
  2011) ...............................................................................................................................19, 33

*Util. Choice, L.P. v. TXU Corp.*,
  No. Civ.A.H-05-573, 2005 WL 3307524 (S.D. Tex. Dec. 6, 2005)..................................16, 17

*Utilimax.com, Inc. v. PPL Energy Plus, LLC*,
  273 F. Supp. 2d 573 (E.D. Pa. 2003), *aff'd*, 378 F.3d 303 (3d Cir. 2004)...........................17

*Volkart Bros., Inc. v. Freeman*,
  311 F.2d 52 (5th Cir. 1962) .................................................................................................32

*Wegoland Ltd. v. NYNEX Corp.*,
  27 F.3d 17 (2d Cir. 1994) ...............................................................................................16, 17

*Weisskopf v. UJA-Fed'n, Inc.*,
  889 F. Supp. 2d 912 (S.D. Tex. 2012) ....................................................................................7

*White v. Am. Dental Ass'n*,
  No. 3:10-CV-2087-L, 2012 WL 537814 (N.D. Tex. Feb. 16, 2010).........................................2

*Wright v. Brady*,
  No. H-06-2021, 2006 WL 2371327 (S.D. Tex. Aug. 15, 2006) ................................................7

## STATUTES

7 U.S.C. § 2.............................................................................................................9, 18, 34

7 U.S.C. § 6.................................................................................................................9, 10

7 U.S.C. § 9...............................................................................................................13, 31

7 U.S.C. § 13..............................................................................................................14, 19

7 U.S.C. § 25 .................................................................................................14, 18, 19, 34

15 U.S.C. § 78 ..........................................................................................................19, 27

28 U.S.C. § 1367 ............................................................................................................15

Tex. Util. Code Ann. §§ 15.021 (West Supp. 2007), 15.023 (West Supp. 2013), 39.157
    (West Supp. 2013), and 39.356 (West Supp. 2007).........................................11, 12

**RULES**

Fed. R. Civ. P. 9(b) .....................................................................................................6, 19

Fed. R. Civ. P. 12(b) .....................................................................................................6, 7

Fed. R. Evid. 404 ............................................................................................................29

**REGULATIONS**

Final Order in Response to a Petition to Exempt Specified Transactions from Certain
    Provisions of the Commodity Exchange Act,
    78 Fed. Reg. 19,880 (Apr. 2, 2013) .................................................9, 10, 11, 19

P.U.C. Subst. R. § 25.503 ...............................................................................................22

P.U.C. Subst. R. § 25.504 ...........................................................................6, 8, 12, 22

Prohibition on the Employment, or Attempted Employment, of Manipulative and
    Deceptive Devices and Prohibition on Price Manipulation,
    76 Fed. Reg. 41,398 (July 14, 2011) (codified at 17 C.F.R. pt. 180) ..............27, 32

**CONSTITUTIONAL PROVISIONS**

Commerce Clause of the U.S. Constitution, Art. I, § 8, cl. 3 .......................................18

**OTHER AUTHORITIES**

Alexander Osipovich, *GDF SUEZ faces CFTC Market Manipulation Probe*, Energy Risk
    (June 24, 2014).........................................................................2, 7, 11, 24

Docket No. 41276, Order Approving Voluntary Mitigation Plan (Mar. 28, 2013)........................8

Docket. No. 42424, Petition for Rulemaking to Eliminate Section []25.504(c) (Apr. 21,
    2014) .........................................................................................................6

Docket No. 42424, Order Denying Petition for Rulemaking (June 20, 2014) ...............................6

Dodd Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010).........................................9

Potomac Economics, Ltd., *2012 State of the Market Report for the ERCOT Wholesale Electricity Markets*, (June 2013).............................................................................................12

CFTC Chairman Gary Gensler, *Statement of Support on Final Order Related to Certain RTO and ISO Electricity Transactions*, (Mar. 28, 2013).........................................................11

I.      **INTRODUCTION**

   A.      **PLAINTIFFS' FIRST AMENDED COMPLAINT ADDS LENGTH BUT NOT DEPTH TO THEIR CLAIMS AND CAUSES OF ACTION**

1.      In April, Plaintiffs Aspire Commodities L.P. ("Aspire") and Raiden Commodities L.P. ("Raiden") (collectively, "Plaintiffs") filed their Original Complaint, setting out what was, assuredly at the time, the most cogent statement of their case.  They made very serious claims of market manipulation, conspiracy, and other nefarious conduct – claims that should not and cannot be made without sound factual and legal bases.  Defendants[1] moved to dismiss that complaint and demonstrated Plaintiffs' utter failure to allege viable causes of action.  Plaintiffs chose not to stand their ground and fight.  Instead they filed their First Amended Complaint ("Complaint" or "FAC"), adding seventy-two additional pages in support of their same dead-on-arrival causes of action.  The bulk of the Complaint is an eighty-five-page section titled "FACTS," the majority of which is a combination of filler, hearsay, and conjecture.  Whatever it is, it cannot support Plaintiffs' causes of action which have not changed; they are as deficient now as they were when originally alleged.

2.      Defendants are generators of electricity participating in the Electric Reliability Council of Texas ("ERCOT") market regulated by the Public Utility Commission of Texas ("PUCT").  Plaintiffs[2] do not dispute that Defendants' actions in the ERCOT real-time market were legal and sanctioned and that those actions occurred in plain sight of anyone participating the Texas electricity market. But Plaintiffs allege that Defendants' legal and regulated ERCOT activities were done with the intent to influence – to Defendants' benefit – commodity futures

---

[1] Defendants are (1) GDF SUEZ Energy North America, Inc. ("GSENA") and (2) Ennis Power Company, LLC; Wise County Power Company, LLC; Midlothian Energy, LLC; Hays Energy, LLC; Wharton County Generation, LLC; and Coleto Power, LP (the "Generator Defendants," and  collectively with GSENA, "GDF SUEZ" or "Defendants").

[2] Plaintiffs are speculators: Raiden apparently speculating in ERCOT's virtual market, and Aspire apparently speculating in commodity futures markets such as the IntercontinentalExchange ("ICE").

markets such as ICE and the ERCOT virtual market.   The nature of Plaintiffs' case is best summarized in reported statements made by their lead counsel after Defendants filed their original motion to dismiss:

> Barry Hammond, a Houston-based lawyer for Aspire and Raiden, concedes that he does not have proof that GDF Suez had derivatives positions that benefited from its ERCOT bidding activities. But he argues that such evidence could emerge if the court allows the lawsuit to proceed and requires GDF Suez to hand over evidence to the plaintiffs. "After that, we will be exchanging documents and any positions that they had will become apparent," Hammond says.[3]

Plaintiffs are fishing, nothing more.

3.      In casting their nets, Plaintiffs run afoul of basic pleading rules.  Knowing that their provocative claims of market manipulation will require proof of Defendants' illicit intent, Plaintiffs rely on hearsay and innuendo that is sourced, at best, to unnamed witnesses and that is devoid of any hint of corroboration:  e.g., "Upon information and belief, GDF Suez has met with outside consultants … who informed GDF SUEZ that it should cease its illegal, manipulative conduct."  FAC at ¶ 26.  Who?  What?  When?  Where?

4.      Plaintiffs also know that that they must plead and prove the impact of Defendants' conduct on the markets Defendants were allegedly attempting to impact.  For this, Plaintiffs often rely on the purely hypothetical:  e.g., "***Had*** GDF Suez ran their 'in-the-money' units . . . the supply curve ***would have*** . . . ." FAC at ¶ 243 (emphasis added).   The Court, in ruling on this motion to dismiss, is not obligated to and should not assume Plaintiffs' hearsay, speculation, or innuendo to be true.[4]

5.      Similarly, the Court can discard the debris that Plaintiffs include presumably for the sole purpose of length.  For example, while it may be true that "January 6, 2014 was the 3rd

---

[3] Alexander Osipovich, *GDF SUEZ faces CFTC Market Manipulation Probe*, Energy Risk (June 24, 2014), Ex. 20.
[4] *See, e.g.*, *White v. Am. Dental Ass'n*, No. 3:10-CV-2087-L, 2012 WL 537814, at *5 (N.D. Tex. Feb. 16, 2010) ("conclusory factual allegations and legal conclusions are not entitled to the assumption of truth").

coldest January day in the past 10 years, and the 8th coldest January day since 1960 in Texas" [FAC at ¶ 209], these facts are not germane to the Court's work on this motion to dismiss. Nothing that Plaintiffs have typed in their ninety-five-page Complaint changes the reality that their claims are unsustainable as a matter of law.

### B.    PLAINTIFFS KNOW THE RULES; THEY DON'T LIKE THE RULES

6.    Plaintiffs allege that Defendants have engaged in a concerted scheme to manipulate the ERCOT real-time market in order to benefit a hypothetical derivatives position on commodity futures markets such as ICE.  However, the truth is far less dramatic.  The facts (even those alleged by Plaintiffs) demonstrate that GDF SUEZ offered to generate and sell electricity in the ERCOT real-time market pursuant to the rules, protocols, guides, policies, and procedures established by ERCOT (together "ERCOT Rules").  As Plaintiffs acknowledge, GDF SUEZ's conduct was in complete conformity with ERCOT Rules and was expressly authorized by the PUCT.  *See* FAC at ¶¶ 17-21, 158.

7.    While Plaintiffs admit that ERCOT real-time prices were not "unlawful, wrong or too high," [FAC at n.18] the entire Complaint nevertheless focuses predominately on prices in the ERCOT market.  Boiled down to its sediment, Plaintiffs' goal is to have this Court intervene in the functions of the ERCOT market and enjoin GDF SUEZ from engaging in actions specifically sanctioned by the PUCT.

8.    Plaintiffs would have this Court impose on every merchant generator operating in the ERCOT market an obligation to limit all offers of electricity to prices no greater than their marginal costs even though ERCOT Rules expressly provide for offers to be well above their marginal costs.  As Plaintiffs acknowledge, ERCOT is an "Energy-Only" market, meaning generally generators are compensated for the energy (and associated ancillary services) they sell to ERCOT and do not receive other payments (e.g., capacity payments) to assist with the

recovery of overhead costs, capital investments, or a return on their investments.  In an Energy-Only market, generators must receive revenue from selling energy in excess of their marginal costs in order to recover their overall costs and to earn a return.  Further, as Plaintiffs acknowledge, the PUCT has found that GDF SUEZ, as a generator with less than five percent of installed generating capacity in ERCOT, "cannot affect LMP prices through its supply or withholding of energy and cannot abuse market power by such withholding."  FAC at ¶¶ 17-21. In basing their Complaint on claims of Defendants' withholding, Plaintiffs simply choose to ignore the PUCT's findings.

9.     Plaintiffs' claim that Defendants' actions in ERCOT manipulated prices of ERCOT-related products on commodity futures markets such as ICE is conjecture.  The prices of ERCOT-related products in the futures markets are derived from the prices for electricity established in ERCOT.  However, this "common knowledge" cannot transform legitimate conduct in ERCOT into manipulation of futures markets.  Plaintiffs do not allege any conduct on ICE, or in any other commodity markets outside ERCOT, that would cause ERCOT-related derivatives on ICE to have an artificial price.  The only transactions of GDF SUEZ that Plaintiffs have identified are trades in the ERCOT market that are fully sanctioned by ERCOT and the PUCT.  Those trades are not subject to the CEA.  Furthermore, according to Plaintiffs' logic, anyone that engages in lawful conduct in ERCOT cannot access markets that trade ERCOT-based derivatives without being subject to claims of market manipulation.

## II.     STATEMENT OF ISSUES

10.     Plaintiffs' Complaint must be dismissed for any and all of the following reasons:

11.     **No Private Right of Action.**  Plaintiffs admit that Defendants did not violate any law or regulation governing the ERCOT market.  Instead, Plaintiffs mistakenly rely on the CEA, which does not permit any of the causes of action asserted.  In recognizing Texas' independent

regulatory regime, the CFTC exempted the ERCOT market from all but a few provisions of the CEA.  In particular, and as explained further below, conduct occurring in the ERCOT market is exempt from the provisions giving rise to a private right of action for violations of the CEA.

12.     **No Standing.**  Plaintiffs' causes of action are premised upon alleged violations of CEA Sections 6(c)(1), (2), and (3).  Plaintiffs argue that Section 22 of "the CEA allows a private right of action for those actually damaged by violations of Sections [6(c)(1)-(3) of the CEA]." FAC at ¶ 270.  To the extent Plaintiffs have a private right of action, they are correct that it must be brought under Section 22.  Plaintiffs lack standing to pursue claims under Section 22, however, because (1) the ERCOT market is exempt from the application of Section 22, and (2) Plaintiffs' claims are completely derivative of Defendants' actions in the ERCOT real-time market.  Notwithstanding the exemption, Section 22 does not allow a private right of action for those damaged by violations of Section 6(c)(2).  Furthermore, Plaintiffs have no right under the CEA to seek injunctive or declaratory relief.

13.     **Filed Rate Doctrine.**  The Fifth Circuit has specifically and unambiguously held that the filed rate doctrine bars claims for damages stemming from rates filed in the ERCOT market that are subject to PUCT oversight.  Because these rates are permitted under ERCOT Rules and deemed filed with the PUCT, as a matter of law, they are not subject to allegations that they are "too high, unfair or unlawful" under the well-settled filed rate doctrine.  Plaintiffs cannot overcome the direct precedent that precludes their claims.

14.     **No "Interstate Commerce" Jurisdiction.**  Plaintiffs' Complaint fails in its entirety because Plaintiffs fail to allege a sufficient nexus to interstate commerce to support a claim under the CEA.  Each of Plaintiffs' causes of action is grounded in a challenge to Defendants' conduct in the ERCOT market.  The ERCOT market is a wholly intrastate market.

-5-

Any alleged effect on interstate commodities markets is insufficient as a matter of law under the definition of "interstate commerce" provided in the CEA.

15.     **Failure to State a Claim.**  Plaintiffs have failed to meet the heightened pleading standard under Rule 9(b) to assert a market manipulation claim sounding in fraud.  Plaintiffs also fail to properly plead the elements of a manipulation claim under either Rule 8's lenient notice pleading standard or Rule 9(b)'s heightened pleading standard, primarily because they fail to plead the scienter required to establish a violation of the CEA.  Plaintiffs' allegation that Defendants traded on lawfully-obtained, nonpublic information has no basis in the law governing commodities markets.  Moreover, the prices for any ERCOT-related products traded on ICE cannot be considered manipulated or "artificial" because the influence of Defendants' ERCOT activity on the prices of such ICE-related derivatives—*if any*—is solely a consequence of lawful activity in ERCOT as permitted by the PUCT.  Finally, for the reasons demonstrated below, Plaintiffs' claim under Count II for aiding and abetting fails as a matter of law.

## III.     NATURE AND STAGE OF PROCEEDING

16.     Plaintiffs filed their Original Complaint on April 22, 2014 [Dkt. No. 1].[5] Defendants filed a motion to dismiss Plaintiff's Original Complaint on June 23, 2014 [Dkt. No. 6].  Plaintiffs filed their response to the motion to dismiss [Dkt. No. 11] and their First Amended Complaint [Dkt. No. 10] on July 14, 2014.  On July 22, 2014, the Court denied Defendants' motion to dismiss as moot [Dkt. No. 14].

## IV.     STANDARDS APPLICABLE TO RULE 12 MOTIONS

17.     **Rule 12(b)(1).** Federal Rule of Civil Procedure 12(b)(1) requires dismissal of a

---

[5] Raiden contemporaneously filed a Petition for Rulemaking to Eliminate § 25.504(c), Project No. 42424, with the PUCT on April 21, 2014 (the "Petition") seeking to repeal the "small fish" rule.  *See* Docket. No. 42424, Petition for Rulemaking (Apr. 21, 2014), Ex. 22.  After considering the Petition and the public comments filed, on June 20, 2014, the PUCT unanimously denied the Petition.  *See* Order Denying Petition for Rulemaking (June 20, 2014), Ex. 23.

claim if the court lacks subject matter jurisdiction over the dispute.  *Weisskopf v. UJA-Fed'n, Inc.*, 889 F. Supp. 2d 912, 918–19 (S.D. Tex. 2012).  "If a plaintiff lacks standing to assert a claim, a federal court lacks subject-matter jurisdiction over that claim."  *Wright v. Brady*, No. H-06-2021, 2006 WL 2371327, at *1 (S.D. Tex. Aug. 15, 2006).  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."  *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

18.    **Rule 12(b)(6)**. Federal Rule of Civil Procedure 12(b)(6) requires dismissal if a plaintiff fails to state a claim upon which relief can be granted. *Grynberg v. BP P.L.C.*, 855 F. Supp. 2d 625, 639 (S.D. Tex. 2012).  While a court must accept as true all of the factual allegations contained in the complaint, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Rather, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.

## V.    MOTION TO DISMISS

19.    Plaintiffs allege that GDF SUEZ withholds energy from and therefore manipulates prices in the ERCOT real-time market by two means: first, by "economic withholding" achieved through pricing strategies and, second, by "physical withholding" achieved through sometimes designating certain of GDF SUEZ's generating units as "OFF" or "EMR."  Plaintiffs claim that GDF SUEZ uses both types of withholding to accomplish one goal: to impact prices in the ERCOT real-time market with the motive of manipulating derivatives markets to its unfair advantage.  As to the latter allegation, Plaintiffs have candidly conceded that they have no evidence – they are just hoping to get to discovery.[6]  But Plaintiffs' problems are more fundamental than even a lack of evidence.  Plaintiffs cannot overcome the fact that GDF

---

[6] *See* Osipovich, *supra* note 3.

SUEZ's actions in ERCOT are subject to and in compliance with extensive and specific regulatory oversight. Specifically, the PUCT has determined that because GDF SUEZ "controls less than 5% of the installed generation capacity in ERCOT … [it] is deemed not to have ERCOT-wide market power." See P.U.C. Subst. R. § 25.504(c), Ex. 18; Voluntary Mitigation Plan ("VMP") at ¶ 6, Ex. 21.[7] The first domino that needs to fall to set Plaintiffs' imagined scheme in motion simply cannot fall. What's more, Plaintiffs know that they are overstating the ability of GDF SUEZ – or any generator – to withhold generation from the market by designating units as either "OFF" or "EMR." As Plaintiffs are forced to acknowledge, ERCOT can always compel units to run if the market demands the generation. FAC at ¶ 158. Even if there was an identifiable market impact of two of GDF SUEZ's Texas units being designated "OFF" or "EMR," and even if GDF SUEZ – using all of its generation – had "ERCOT-wide market power," the scheme could not have a predictable, manipulative impact. ERCOT can always cause the turbines to spin. This is part of the regulatory oversight that minds all generation and pricing activities in ERCOT, including, of course, the activities of GDF SUEZ. Largely because of this oversight, Defendants' bases for dismissal, each set out below, apply equally to Plaintiffs' allegations of economic and physical withholding.

### A.     THERE IS NO PRIVATE RIGHT OF ACTION THAT PLAINTIFFS CAN PURSUE UNDER THE COMMODITY EXCHANGE ACT

20.     The CFTC has exempted transactions in the ERCOT market from all CEA private rights of action. Allowing Plaintiffs to maintain a private right of action under the CEA to challenge as manipulation prices in ERCOT (and, indirectly, prices in commodity futures markets such as ICE that reference ERCOT prices) theoretically resulting from Defendants' lawful conduct specifically authorized and regulated by the PUCT would undermine the very

---

[7] See Docket No. 41276, Order Approving Voluntary Mitigation Plan (Mar. 28, 2013), Ex. 21.

purpose of the exemption.  On April 2, 2013, the CFTC entered a Final Order pursuant to its broad authority under Section 4(c)(6) [7 U.S.C. § 6(c)(6)] of the CEA that specifically exempts the ERCOT market "from the provisions of the CEA and Commission regulations, with the exception of *the Commission's* general anti-fraud and anti-manipulation authority, and scienter-based prohibitions, under CEA Sections 2(a)(l)(B), 4(d), 4b, 4c(b), 4*o*, 4s(h)(l)(A), 4s(h)(4)(A), 6(c), 6(d), 6(e), 6c, 6d, 8, 9, and 13 of the Act and any implementing regulations promulgated under these sections . . . ."  *See* Final Order in Response to a Petition to Exempt Specified Transactions from Certain Provisions of the Commodity Exchange Act, 78 Fed. Reg. 19,880, 19,880 (Apr. 2, 2013) ("Final Order") (emphasis added), Ex. 16.  While the CFTC specifically excepted its own anti-fraud and anti-manipulation authority from the exemption, it just as clearly did **not** except private rights of action under Section 22.  The CFTC's Final Order explicitly states, however, that in granting the exemption, it does not express an opinion as to whether the CFTC has jurisdiction over the ERCOT market with regard to the anti-fraud and anti-manipulation powers that it retained.[8]

21.    The CFTC exemption is in line with the congressional intent behind the amendments to the CEA enacted under the Dodd Frank Wall Street Reform and Consumer Protection Act ("Dodd Frank"), Pub. L. No. 111-203, § 722, 124 Stat. 1376, 1672 (2010), Ex. 24. In enacting Dodd Frank, Congress recognized the unique status of transactions effectuated in regulated electricity markets including ERCOT.  As such, Dodd Frank included a savings clause directed to such markets stating*, inter alia*, that "[n]othing in this [Act] shall limit or affect any statutory authority of . . . a State regulatory authority [] with respect to an agreement, contract, or transaction that is entered into pursuant to a tariff or rate schedule approved by . . . a State regulatory authority."  7 U.S.C. § 2(a)(1)(I)(i).  More importantly, to preserve the primacy of the

---

[8] *See* Final Order, 78 Fed. Reg. at 19,881 n.15, Ex. 16.

regulatory authorities governing such markets, Congress specifically provided that, when it found it was in the public interest to do so, the CFTC should

> exempt from the requirements of the [CEA] an agreement, contract, or transaction that is entered into . . . pursuant to a tariff or rate schedule establishing rates or charges for, or protocols governing, the sale of electric energy approved or permitted to take effect by the regulatory authority of the State or municipality having jurisdiction to regulate rates and charges for the sale of electric energy within the State.

7 U.S.C. § 6(c)(6)(B).[9]   Accordingly, it was the intent of the framers of Dodd Frank to: (1) specifically recognize the status of transactions such as those conducted in ERCOT pursuant to PUCT supervision; (2) ensure that such supervision was not affected by Dodd Frank; and (3) provide a mechanism to exempt such electricity markets and transactions from the CEA.  The CFTC unanimously voted to implement congressional intent by issuing an order exempting ERCOT transactions from the CEA, saving only its own anti-manipulation authority.

22.     Plaintiffs incorrectly assert that the CFTC exemption applicable to ERCOT transactions does not apply to Plaintiffs' claims because those claims are premised on ICE transactions.  *See* FAC at n.17.  To the contrary, Plaintiffs' claims are grounded in GDF SUEZ's "actions within ERCOT."  FAC at ¶ 54.  Therefore, the conduct Plaintiffs challenge, namely the price at which GDF SUEZ offered certain generation capacity into the ERCOT real-time market, falls squarely within the confines of the exemption set forth in the Final Order.[10]   Plaintiffs

---

[9] The CFTC's broad authority is limited only by CEA Section 4(d), which provides that "[t]he granting of an exemption under this section shall not affect the authority of the Commission . . . to conduct investigations . . . or to take enforcement action for any violation of any provision of this chapter . . . ." 7 U.S.C. § 6(d).  There is no such savings clause for the private right of action.

[10] To qualify for the exemption, the transaction in question must first be one of the enumerated, energy-related products that are defined within the Final Order.  Section 2(a)(2) of the Final Order encompasses "Energy Transactions," which are defined to include "transactions in a . . . 'Real-Time Market' . . . for the purchase or sale of a specified quantity of electric energy at a specified location . . . ."  *See* Final Order, 78 Fed. Reg. at 19,913.  Second, the subject transaction must be offered into the market by an "appropriate person," as that term is defined within the confines of the CEA and the Final Order.  The CFTC clarified that the term includes "persons [like GDF SUEZ] who are in the business of . . . [g]enerating, transmitting, or distributing electric energy . . . ."  *Id.* at 19,880.  Finally, the transaction at issue must be conducted pursuant to a "tariff, rate schedule, or protocol . . . approved or permitted to have taken effect by . . . the [PUCT]."  *Id.*  It is undisputed that the alleged transactions were fully

cannot circumvent this exemption by complaining that commodity prices arrived at lawfully in ERCOT become unlawful and manipulative when Plaintiffs seek to speculate on the same underlying commodities in futures markets such as ICE.  Further, Plaintiffs' argument that their case is grounded in "transactions on ICE" is belied by both the overwhelming detail provided in their ninety-five-page Complaint regarding GDF SUEZ's conduct within ERCOT and their own counsel's admission that Plaintiffs have zero evidence of any actual "transactions on ICE" by GDF SUEZ.[11]  Conduct within ERCOT is simply not subject to scrutiny by a private litigant under the CEA.[12]  This conclusion does not mean that the transactions at issue in this case are exempt from comprehensive regulatory oversight.  In fact, in exempting ERCOT transactions from the CEA, CFTC Chairman Gary Gensler recognized the special status of regulated markets like ERCOT under Dodd Frank and the primacy of PUCT regulation, stating, "Congress authorized that these transactions be exempt from certain provisions of [Dodd Frank] as they are subject to extensive regulatory oversight by  . . . the [PUCT]."[13]

23.     As recognized in the Final Order, the PUCT retains its long-standing authority to regulate the ERCOT market, including its authority to monitor for abuses of "market power associated with the generation, transmission, distribution, and sale of electricity in [Texas]."  Tex. Util. Code Ann. § 39.157 (West Supp. 2013) ("PURA").  Pursuant to this legislative grant of authority, the PUCT has the power to ferret out and deter abuses of market power by exercising its rights to seek injunctive relief and civil penalties in a court of law, assess

---

compliant with GDF SUEZ's VMP, by which the PUCT specifically permitted offers of generation into the real-time market at prices up to the system-wide offer cap.

[11] See Osipovich, supra note 3.

[12] Additionally, Plaintiffs admit that, while Aspire may have traded on ICE,  Raiden's activity was wholly within the ERCOT market.  See FAC at ¶¶ 276 (stating that Raiden's damages resulted from its trades on ERCOT's virtual market).  The CFTC's Final Order clarifies that exempted "Energy Transactions include virtual and convergence bids and offers, as they are methods of conducting such Energy Transactions."  See Final Order, 78 Fed. Reg. at n.46.   The CEA exemption regarding ERCOT transactions therefore applies to bar each of Raiden's claims.

[13] CFTC Chairman Gary Gensler, Statement of Support on Final Order Related to Certain RTO and ISO Electricity Transactions, (Mar. 28, 2013), Ex. 26.

administrative penalties, order disgorgement of all unlawfully-obtained excess revenue, and suspend or revoke a violator's registration to operate in the ERCOT market. PURA §§ 15.021 (West Supp. 2007), 15.023 (West Supp. 2013), and 39.356 (West Supp. 2007). The PUCT also has the authority to enter into a VMP with any market participant to provide a safe harbor against an allegation of market power abuse for adhering to an agreed upon course of conduct. P.U.C. Subst. R. § 25.504(e), Ex. 18. It is pursuant to this authority that the PUCT granted GDF SUEZ's request for a VMP, concluded GDF SUEZ lacked ERCOT-wide market power, and expressly authorized the conduct that now forms the basis of Plaintiffs' withholding claims in the Complaint. The PUCT also exercised its authority in unanimously rejecting Plaintiffs' Petition, filed at the same time that Plaintiffs initiated this case, challenging the PUCT "small fish" rule, which serves as the backbone to GDF SUEZ's VMP. *See* n.6 *supra*. The ERCOT market is also subject to pervasive oversight by its Independent Market Monitor, Potomac Economics, that is charged with identifying conduct that would compromise the competitive performance and operational efficiency of the market. Contrary to Plaintiffs' assertion, Potomac Economics never reached any conclusion that GDF SUEZ's conduct amounted to "economic withholding." FAC at ¶ 144.[14]

24. It was in recognition of this regulatory framework that the CFTC issued the Final Order and granted the broad exemption to ERCOT. Both Congress and the CFTC recognized that dual regulation of such markets would only lead to inefficiency and confusion. A functional, efficient market can only have one set of rules and one regulator. The exemption allows the PUCT to efficiently and effectively regulate the ERCOT market. The fact that ICE offers contracts that reference ERCOT prices does not nullify this exemption nor permit

---

[14] Potomac Economics, Ltd., *2012 State of the Market Report for the ERCOT Wholesale Electricity Markets*, at 99-102 (June 2013), Ex. 25.

Plaintiffs a private right of action under the CEA premised upon prices in commodity futures markets such as ICE that are derived from prices lawfully established in ERCOT.

### B.     PLAINTIFFS LACK STANDING

#### 1.     Plaintiffs Lack Standing to Pursue a Private Right of Action

25.     Plaintiffs' claims are premised upon alleged violations of CEA Sections 6(c)(1), (2), and (3).  7 U.S.C. §§ 9(1), (2), and (3).  Plaintiffs assert that the "CEA allows for a private right of action for those actually damaged by violations of Sections [6(c)(1), (2), and (3)]" pursuant to CEA Section 22.  FAC at ¶ 270.  Plaintiffs are correct that, to the extent they have a claim under the CEA, it must be brought pursuant to Section 22.[15]  However, for two reasons, Plaintiffs lack standing to assert the claims that they have made.

26.     First, under no circumstances does the CEA allow for a private right of action for activities in contravention of  Section 6(c)(2) which proscribes "false or misleading statement[s] of a material fact to the Commission" 7 U.S.C. § 9(2).  Only the CFTC may bring an action for misrepresentations made to the Commission.  Second, Plaintiffs' claims are grounded in GDF SUEZ's "actions within ERCOT."  FAC at ¶ 54.  As more completely explained in Section V.A. of this motion, when the CFTC issued the Final Order exempting the ERCOT market from the application of significant parts of the CEA, it exempted the ERCOT market from the application of Section 22.  Section 22 of the CEA cannot be the basis of Plaintiffs' challenge to "actions within ERCOT" – the "actions" that are the backbone of all of Plaintiffs' claims.

#### 2.     Plaintiffs Lack Standing to Seek Injunctive Relief

27.     Count III suffers from Plaintiffs' continued refusal to distinguish between rights belonging to private litigants and those belonging to the CFTC alone.  Private litigants do not

---

[15] *See also In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) ("*Amaranth I*"), (confirming that "buyers and sellers of commodities can sue a trader who was not their counterparty only under section 22").

have the authority to seek injunctive relief under the CEA.  Section 22(a) of the CEA, which renders entities found to have violated its provisions "liable for actual damages," provides that "the rights of action authorized by this subsection . . . shall be the ***exclusive remedies*** under this chapter available to any person who sustains loss as a result . . ."  7 U.S.C. § 25(a)(2) (emphasis added).  This language has been interpreted to "limit[] damages to private litigants bringing claims under the CEA to 'actual damages' only."  *In re Cannon*, 230 B.R. 546, 594 (Bankr. W.D. Tenn. 1999), *rev'd on other grounds*, *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, NO. 99-2605 G/A, 2000 WL 34400479 (W.D. Tenn., Mar. 31, 2000).

28.     The authority to bring an action for injunctive relief for a violation of the CEA is reserved for the CFTC alone.  CEA Section 6c, entitled "Enjoining or restraining violations," provides as follows:

> Whenever it shall appear **to the Commission** that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter. . . **the Commission may bring an action** . . . to enjoin such act or practice, or to enforce compliance with this chapter [7 USCS §§ 1 et seq.], or any rule, regulation or order thereunder . . . .

7 U.S.C. § 13a-1(a) (emphases added).  "Section 6c of the [CEA], 7 U.S.C. § 13a-1, grants to the Commission broad equitable powers which are not conferred upon private parties." *Merrill Lynch Futures Inc. v. Kelly*, No. 84 Civ. 2406-CSH, 1984 WL 217, at *2 (S.D.N.Y. Apr. 19, 1984) (denying plaintiffs' request for a preliminary injunction finding such "drastic relief . . . available only to the Commission").  Plaintiffs lack standing to pursue an action for injunctive relief, and Count III of their Complaint must be dismissed with prejudice.

### 3.     Plaintiffs Lack Standing to Seek Declaratory Relief

29.     Actual damages are the exclusive remedy available to private litigants under the CEA.  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 620 (S.D.N.Y. 2013) ("*LIBOR II*").  Plaintiffs therefore have no standing to sue for declaratory relief and,

accordingly, Count IV must be dismissed with prejudice. Furthermore, should the Court dismiss Counts I–III, any subject matter jurisdiction the Court has over Count IV would terminate. "The Declaratory Judgment Act is not an independent ground for jurisdiction; it permits the award of declaratory relief only when other bases for jurisdiction are present." *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980). No such independent basis for subject matter jurisdiction exists here.[16] In any event, Count IV should be dismissed on the grounds that it is duplicative of relief sought elsewhere in the Complaint. *See, e.g.*, *Ladd v. Colonial Sav., F.A.*, No. 3:13-CV-1817-P, 2014 WL 1393038, at *5 (N.D. Tex. Apr. 10, 2014).

### C. THE "FILED RATE DOCTRINE" BARS PLAINTIFFS' CLAIMS

30. Plaintiffs' claims regarding Defendants' alleged violations of the CEA fail as a matter of law and should be dismissed pursuant to Rule 12(b)(6) because Plaintiffs are asking this Court to determine what electricity prices **should have been** in ERCOT on particular days and hours in 2013 and to change existing law. Despite Plaintiffs' protestations,[17] all of Plaintiffs' claims are premised on the allegation that prices in the ERCOT real-time market were too high because of Defendants' conduct. Notwithstanding Plaintiffs' admission that ERCOT power prices "were not unlawful, wrong, or too high," [FAC at n.18] Plaintiffs allege damages based on a "reconstruct[ion] of supply and demand curves" by which Plaintiffs calculated that

---

[16] Similarly, the Court's dismissal of Counts I–III would terminate any subject matter jurisdiction it might have over all vaguely asserted common law claims over which Plaintiffs allege the Court retains ancillary jurisdiction under 28 U.S.C. § 1367. FAC at p. 4.

[17] In the Complaint, Plaintiffs argue that the filed rate doctrine does not apply because "Plaintiffs are not challenging—and their claim is not based on—the LMP prices in ERCOT." FAC at n.18. This is simply not true. Throughout their Complaint, Plaintiffs specifically and continuously allege that GDF SUEZ's actions caused the LMP prices in ERCOT to be higher than they should have been. *See, e.g.*, FAC at ¶¶ 69, 75, 89, 90, 101, 102, 112, 113, 132, 137, and 264. In fact, Count I explicitly is premised on this allegation: "Through its multiple withholding schemes described above, GDF Suez intentionally, knowingly, and recklessly manipulated, and continues to manipulate, the price of electricity in the ERCOT market and has caused the prices in ERCOT's Real Time market to increase artificially . . . ." FAC at § 271. Plaintiffs cannot credibly argue that their claims are not based on the LMP prices in ERCOT. Plaintiffs' claims for damages would "require the court to set damages by assuming a hypothetical rate" in violation of the filed rate doctrine. *See E & J Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1040 (9th Cir. 2007).

GDF SUEZ's alleged economic and physical withholding "materially caused the balance-of-the-day average peak power prices to be higher than they would have been absent GDF SUEZ's withholding."  FAC at ¶ 44.  This is precisely the type of claim the filed rate doctrine forecloses.

31.    "The filed rate doctrine bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful."  *Tex. Commercial Energy v. TXU Energy, Inc*., 413 F.3d 503, 507 (5th Cir. 2005) ("*TCE*"); *see also Util. Choice, L.P. v. TXU Corp.*, No. Civ.A.H-05-573, 2005 WL 3307524, at *2 (S.D. Tex. Dec. 6, 2005).  The filed rate doctrine was first recognized in *Keogh v. Chi. & N. W. Ry. Co.*, 260 U.S. 156 (1922) and provides that "any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers."  *TCE*, 413 F.3d at 507-08 (quoting *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)).  In *Keogh*, the Supreme Court held that a plaintiff could not be "injured in his business or property" by paying rates that had been approved by the Interstate Commerce Commission and were thus legal rates.  *Keogh*, 260 U.S. at 163.  The Court noted that "[i]njury implies violation of a legal right," and that a legal rate (i.e., the rate approved by the regulator) could not cause such a violation.  *Id.*

32.    The filed rate doctrine is driven by the principle that legislative bodies create agencies for the specific purpose of setting rates, and courts are not well suited to engage in retroactive rate setting.  *See Marcus v. AT&T Corp.*, 138 F.3d 46, 59–61 (2d Cir. 1988).  For a court to sustain a challenge to a rate, it must second-guess the rate set by the agency and make a post-hoc determination of a hypothetical "reasonable" rate.  The Supreme Court rejected this role, holding that the "abstract" reasonableness inquiry should be left to the regulators.  *See Mont.-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951).  The doctrine applies

even where it might be possible for a court to calculate some other rate, because the courts defer to the oversight of the agency.  *See id.* at 251; *Wegoland*, 27 F.3d at 19.  "Application of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results."  *Util. Choice*, 2005 WL 3307524, at *2 (quoting *Marcus*, 138 F.3d at 58).

33.     The Fifth Circuit has held that the filed rate doctrine bars claims for damages stemming from rates "filed" in the Texas energy market that are subject to PUCT oversight. *TCE*, 413 F.3d at 509–10.  The Fifth Circuit held that, even though the PURA does not require rates in the ERCOT market to be "filed" with the PUCT, and even though the PUCT does not set or approve rates, the "PUCT's oversight over the market is sufficient to conclude that . . . energy rates are 'filed' within the meaning of the filed rate doctrine."  *Id*. at 510.  Therefore, the filed rate doctrine applies even despite Plaintiffs' allegation that GDF SUEZ "do[es] not offer electricity to the grid at a rate approved by a regulator."  FAC at ¶ 9.  Furthermore, as Plaintiffs admit, the PUCT specifically authorized the alleged conduct at issue here.  *See* FAC at ¶¶ 17–21, 158.  Pursuant to the filed rate doctrine, this Court must defer to the PUCT's authority over the ERCOT market and dismiss Plaintiffs' claims with prejudice.[18]

### D.     PLAINTIFFS FAIL TO MEET THE "INTERSTATE COMMERCE" JURISDICTIONAL REQUIREMENT OF THE CEA

34.     This Court lacks jurisdiction over Plaintiffs' CEA claims because Plaintiffs have failed as a matter of law to plead facts that meet the "interstate commerce" jurisdictional requirements of the CEA and the Commerce Clause of the U.S. Constitution, Art. I, § 8, cl. 3.

---

[18] The filed rate doctrine bars any claim or cause of action that challenges the reasonableness of rates.  *Marcus*, 138 F.3d at 58; s*ee also TCE*, 413 F.3d at 508–09 (state and federal antitrust law); *Taffet v. S. Co.*, 967 F.2d 1483, 1485, 1488 (11th Cir. 1992) (en banc) (federal RICO); *Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 273 F. Supp. 2d 573, 574, 584 (E.D. Pa. 2003), *aff'd*, 378 F.3d 303 (3d Cir. 2004) (federal antitrust laws "and numerous state laws").  The filed rate doctrine even bars claims alleging that rates were established by fraud.  *See Wegoland*, 27 F.3d at 22.

Plaintiffs' claims under the CEA require a connection to "interstate commerce" in order to constitute a violation. *See* 7 U.S.C. § 25(a)(1)(D). Furthermore, the Commerce Clause also requires a nexus to interstate commerce for Congressional authority and federal jurisdiction. *Jones v. United States*, 529 U.S. 848, 851-52 (2000). Plaintiffs claim that "GDF SUEZ's manipulation of prices in the commodities markets, ***through its actions within ERCOT***, create artificial and unpredictable prices on ICE and directly manipulate the values in virtual trades . . ." FAC at ¶ 54 (emphasis added). The only activities that Plaintiffs alleged based on fact and not conjecture are activities that occurred within the wholly-intrastate ERCOT market.[19]

35.     Plaintiffs appear to allege a connection to interstate commerce based on the argument that GDF SUEZ's conduct in the ERCOT market affected interstate commodity futures markets such as ICE. However, a mere effect on interstate commerce is insufficient to support jurisdiction under the CEA.[20] The CFTC has addressed the interpretation of the definition of interstate commerce in the CEA and has noted the following: "Congress chose not to include . . . phrases such as 'affect interstate commerce,' 'affecting interstate commerce' or 'affects interstate commerce' in Section 1a(13) or 2(b);" further "[g]iven [Congress's] demonstrated ability to use words that clearly convey the intent to impose specific prohibitions or prescriptions upon persons or acts that merely 'affect' interstate commerce, the use of more restrictive language in Sections 1a(13) and 2(b) support the inference that Congress had a different intent when it drafted them." *Roger J. Wright*, Comm. Fut. L. Rep. (CCH) ¶ 29412, n.213 (Feb. 25, 2003), CFTC No. 97-2, 2003 WL 548760, at *20 n.213. An alleged effect on interstate commerce is insufficient under

---

[19] As recognized by the Fifth Circuit, "Texas' electrical system is independent from the rest of the United States' which is administered through the Federal Energy Regulatory Commission." *TCE*, 413 F.3d at 506 n.1. As the Southern District acknowledged, "If the Texas energy market is truly intra-state, then this Court has no jurisdiction over [claims] that require a nexus to interstate commerce." *Tex. Commercial Energy v. TXU Energy, Inc.*, No. C-03-249, 2004 WL 1777597, at *9 n.8 (S.D. Tex. June 24, 2004).

[20] The definition of "interstate commerce" in the CEA contains a requirement that the transactions must have been undertaken "***with the expectation*** that [the commodity would] end [its] transit, after purchase, in another [State]." 7 U.S.C. § 2(b) (emphasis added).

the CEA, and Plaintiffs' claims should be dismissed.[21]

### E.    PLAINTIFFS FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

#### 1.    Plaintiffs Fail to Meet the Heightened Pleading Standard Required to State a CEA Claim Sounding in Fraud

36.    Although Plaintiffs are careful never to use the word "fraud" in the Complaint, Plaintiffs' allegations of economic and physical withholding sound in fraud and, therefore, must meet the heightened pleading standard required for fraud-based claims under Federal Rule of Civil Procedure 9(b).  *See, e.g.*, FAC at ¶ 275 (alleging GDF SUEZ engaged in "intentional, knowing, or reckless dissemination of false and misleading information").[22]

37.    Pursuant to Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud."  While the Fifth Circuit has not reached the issue as to the applicability of the heightened pleading standard to causes of action arising under the CEA, the weight of authority in other jurisdictions mandates, at a minimum, that claims sounding in fraud, such as the ones asserted by Plaintiffs, must meet the more stringent requirement.[23]  Indeed, as

---

[21] Any alleged effect on the ERCOT virtual market is clearly insufficient to support a nexus to interstate commerce. The ERCOT virtual market is administered by ERCOT and does not offer futures, swaps or commodities traded in interstate commerce.  The virtual market exists to allow ERCOT market "participants to trade on differences between the [ERCOT] Day-Ahead Market and the Real-Time Market."  FAC at ¶ 15.  In exempting virtual transactions from the reach of the CEA, the CFTC concluded that virtual bids and offers should be treated the same as physical energy transactions in ERCOT's wholly-intrastate market.  *See* Final Order, 78 Fed. Reg. at 19887-88. Because all of Raiden's alleged damages resulted from activity in the ERCOT virtual market, [FAC at ¶ 141 and 245]  not only have their claims have been specifically exempted from the reach of the CEA, they should also be dismissed with prejudice because Raiden has failed to allege even a tangential connection to interstate commerce.

[22] To successfully allege a violation of CEA Section 22(a)(1)(D)(i), Plaintiffs must allege fraud.  *See* 7 U.S.C. § 25(a)(1)(D)(i) (requiring the use or employment of a "manipulative device or contrivance"); *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1063 (2014) (applying 9(b) standard to similar language under 15 U.S.C. 78j and Rule 10b-5).  Moreover a claim under CEA Section 22(a)(1)(D)(ii) based on allegations of economic and physical withholding also must sound in fraud.  *See, e.g.*, *United States v. Radley*, 659 F. Supp. 2d 803, 816 (S.D. Tex. 2009) (requiring a withholding claim under the CEA to involve false or misleading statements), *aff'd on other grounds*, 632 F.3d 177 (5th Cir. 2011) (Radley was brought under Section 9(a)(2) of the CEA, which mirrors the language of Section 22(a)(1)(D)(ii) and makes it a felony for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce." 7 U.S.C. §13(a)(2)).

[23] Defendants are aware of no Fifth Circuit authority determining whether Rule 8 or Rule 9(b) applies to fraud-based claims under Section 22(a)(1)(D)(ii) of the CEA.  In *Hershey v. Energy Partners, L.P.*, the Fifth Circuit did not reach the issue because it determined the plaintiffs failed to state a claim under Rule 8's liberal pleading

one court explained:

> Although plaintiffs have apparently carefully avoided the word "fraud" in their complaint, this is not dispositive in a determination of the essence of the factual premises of their claim, nor whether Rule 9(b) applies.  The wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  As such, we turn to the allegations as pled in the complaint to determine if they sound in fraud.[24]

More recently, some district courts have eschewed the case-by-case approach, finding that all private manipulation claims must meet the heightened pleading standard.  *Amaranth I*, 587 F. Supp. 2d at 528-29 (holding that "a plaintiff alleging manipulation" must "comply with the requirements of Rule 9(b)").  Just last month, the Southern District of New York again held that, "[i]n the context of claims for commodities manipulation . . . a plaintiff must also meet the heightened pleading requirements of [Rule] 9(b)."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, --- F. Supp. 2d ---, No. 11 MD 2262(NRB), 2014 WL 2815645, at *3 (S.D.N.Y. June 24, 2014) ("*LIBOR III*").  However, regardless of whether the heightened 9(b) standard is applied in *all* causes of action arising under the CEA or only on a case-by-case basis, because Plaintiffs' claims sound in fraud, they must meet the heightened pleading standard.

38.     To satisfy the pleading requirements of Rule 9(b) for a market manipulation claim under the CEA, Plaintiffs must specify:  (1) what manipulative acts were performed, (2) which defendants performed the manipulative acts, (3) when the manipulative acts were performed, and

---

standard.  610 F.3d 239, 245 n.12 (5th Cir. 2010).  While two Southern District of Texas cases (*CFTC v. Johnson*, 408 F. Supp. 2d 259, 270 (S.D. Tex. 2005) and *CFTC v. Enron Corp.*, No. H-03-909, 2004 WL 594752, at *3 (S.D. Tex. Mar. 10, 2004)) declined to apply Rule 9(b) to CEA market manipulation claims, a more recent line of cases in the Southern District of New York has applied Rule 9(b)'s heightened pleading standard to private manipulation claims under the CEA where the cause of action sounds in fraud.  *See, e.g., CFTC v. Wilson*, ---F. Supp. 2d---, No. 13 Civ. 7884(AT), 2014 WL 2884680, at *11 (S.D.N.Y. June 26, 2014) (agreeing that market manipulation claims that sound in fraud must meet the heightened pleading standard under 9(b)).

[24] *In re Crude Oil Commodity Litig.*, No. 06-Civ-6677(NRB), 2007 WL 1946553, at *5 (S.D.N.Y. June 28, 2007) (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).  As acknowledged by the Southern District of Texas in *In re Energy Transfer Partners Natural Gas Litig.*, the Southern District of New York held that market manipulation is "inherently deceptive," such that a complaint alleging manipulation must satisfy Rule 9(b)'s heightened pleading standard.  No 4:07-cv-3349, 2009 WL 2633781, at *8 (S.D. Tex. Aug. 26, 2009) (citing *Amaranth I*, 587 F. Supp. 2d at 535).

(4) what effect the scheme had on the market for the securities at issue. *See, e.g.*, *In re Crude Oil*, 2007 WL 1946553, at *7 (further holding that this relaxed standard under Rule 9(b) applicable to market manipulation claims "is not a license to base claims of fraud on speculation and conclusory allegations") (internal citations and quotation marks omitted). Plaintiffs fail to articulate a manipulative scheme that would satisfy the initial prong of the required analysis.

39.     With regard to economic withholding, in an apparent attempt to imply some level of deception, Plaintiffs complain that GDF SUEZ's statements of its expected generation within ERCOT failed to disclose its alleged intent to economically withhold generation. FAC at ¶¶ 97, 275. However, as Plaintiffs admit, GDF SUEZ's day-ahead offers do not exhibit any "intent to run." Transactions in the day-ahead market result in *financial commitments only*. *See* FAC at ¶ 80 (admitting "GDF SUEZ can fulfill this obligation by either producing at the generator node, or by purchasing the electricity at that location at the spot price in the Real-Time Market"). The notion that GDF SUEZ can be liable for fraud where its conduct was in concert with the ERCOT market design and expressly endorsed by the PUCT is unsupportable.

40.     Plaintiffs fail to plead with sufficient specificity their allegations of physical withholding. Plaintiffs allege with no factual support whatsoever that GDF SUEZ physically withheld generating units with the intent to manipulate the ERCOT market by designating the units as either "OFF" or "EMR." FAC at ¶¶ 146-147. While Plaintiffs allege either of these designations "removes the unit from ERCOT's consideration of the available generation," they admit only a few paragraphs later that units designated as either "OFF" or "EMR" are, in fact, available under certain conditions. FAC at ¶¶ 155, 158. Plaintiffs simply make the unsubstantiated allegation that these designations were not "related to any physical need to have its units removed from generation." FAC at ¶ 147. The Complaint fails to allege that GDF

SUEZ's use of the designations was in violation of either PUCT or ERCOT Rules.  In fact, nowhere do Plaintiffs identify any legal obligation for generators to offer generation as available except for "physical need."   Furthermore, an allegation of either economic or physical withholding under the PUCT Rules requires the alleged violator to possess market power.  *See* P.U.C. Subst. R. § 25.503(g)(7), Ex. 17.  Pursuant to the "small fish" rule, and as memorialized in the VMP, because GDF SUEZ "controls less than 5% of the installed generation capacity in ERCOT . . . [it] is deemed not to have ERCOT-wide market power."  See P.U.C. Subst. R. § 25.504(c), Ex. 18; VMP at ¶ 6, Ex. 21.

41.    Because Plaintiffs have failed to identify any manipulative acts with the specificity required under Rule 9(b), Plaintiffs' Complaint must be dismissed.[25]  *See United States ex rel. Steury v. Cardinal Health, Inc.*, 735 F.3d 202, 204 (5th Cir. 2013) ("A dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6).") (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 n.8 (5th Cir. 2009)).

### 2.    Plaintiffs Fail to Plead Specific Intent

42.    To survive dismissal, Plaintiffs must adequately allege that Defendants specifically intended to manipulate the ERCOT virtual and ICE futures markets.  Plaintiffs' Complaint, while verbose, is devoid of anything other than unsubstantiated allegations that are neither reliable nor sufficient to plead scienter under the CEA.  Although malice, intent, and conditions of the mind may be pled generally under Rule 9(b), Plaintiffs must still allege facts that "give rise to a *strong inference* of scienter."  *In re Amaranth Natural Gas Commodities*

---

[25] Further, Plaintiffs claims against the Generator Defendants must be dismissed with prejudice as Plaintiffs have failed to state any facts supporting a claim that any of the individual Generator Defendants performed any manipulative acts.  *See LIBOR III*, 2014 WL 2815645, at *7 ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and 'lumping' all defendants together fails to satisfy the particularity requirement").

*Litig.*, 612 F. Supp. 2d 376, 384 (S.D.N.Y. 2009) ("*Amaranth II*") (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007)) (emphasis in original). "[I]t is insufficient to allege merely a 'generalized motive' that could be 'imputed to any publicly-owned, for-profit endeavor." *LIBOR II,* 962 F. Supp. 2d at 616 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)).

43.     Scienter in the commodities context requires "the intent to deceive, manipulate, or defraud." *Hershey*, 610 F.3d at 246 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 (1976)). "Rule 9(b) imposes a significant burden on allegations of scienter.  Scienter can be pled by 'alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of misbehavior or recklessness." *Amaranth II*, 612 F. Supp. 2d at 383; *see also Hershey*, 610 F.3d at 246 (citing *Amaranth I* and adopting the specific intent standard for CEA private causes of action).

### a.     Motive and Opportunity

44.     In order to plead motive, Plaintiffs must "assert a concrete and personal benefit to the individual defendants resulting from the [alleged] fraud."  *Amaranth I*, 587 F. Supp. 2d at 530.  Plaintiffs' ninety-five-page Complaint, however, fails to identify anything other than a hypothetical motive to manipulate the ICE futures market.  Plaintiffs have no evidence that Defendants maintained any position on the ICE futures market that stood to benefit from increased real-time prices in the ERCOT physical market on the specific trading days in question.  Their own counsel has admitted as much in statements to the press following the filing of Defendants' original motion to dismiss.[26]  His admission makes it clear that their lawsuit is nothing more than a fishing expedition and also confirms that every allegation regarding Defendants' purported profits in the ICE market is based on nothing more than conjecture.  FAC

---

[26] *See* Osipovich, *supra* note 3.

at p. 3, ¶ 1.   The argument that evidence of intent "could emerge" in discovery ignores well-settled Supreme Court precedent that plaintiffs armed with nothing more than conclusions cannot unlock the doors to discovery.   *Iqbal*, 556 U.S. at 678-79.   Further, the stringent pleading standards under Rule 9(b) exist as a "gatekeeper to discovery, a tool to weed out meritless fraud claims sooner than later."   *Grubbs*, 565 F.3d at 185.   Plaintiffs' "contention, that discovery will unearth information tending to prove [their] contention of fraud, is precisely what 9(b) attempts to discourage."   *Madonna v. United States,* 878 F.2d 62, 66 (2d Cir. 1989) (citing *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir.1982) ("Rule 9(b) [fails] in its purpose if conclusory generalizations . . . will permit a plaintiff to set off on a long and expensive discovery process in the hope of uncovering some sort of wrongdoing . . .")).

45.   Lacking any evidence of an identifiable futures position, Plaintiffs resort to supposition and speculation to conjure up a motive that "could have" driven Defendants' "scheme."   Plaintiffs hypothesize that there "is no rational explanation for GDF SUEZ's [behavior] unless it stood to gain . . . by trading on ICE or trading ERCOT virtuals."   FAC at ¶ 70; *see also, e.g.*,   ¶¶ 58, 62, 103, and 146.   Plaintiffs make this argument repeatedly in their Complaint; however, without more, "vague allegations of purportedly 'uneconomic conduct' . . . [cannot] support an inference of intent."   *In re Commodity Exch. Inc. Silver Futures and Options Trading Litig.*, 560 F. App'x 84, 86-87 (2d Cir. 2014).   Regardless, Plaintiffs in fact identify precisely the rational, economic explanation for GDF SUEZ's conduct.   Prices in ERCOT are established based on the offer price of the market clearing (marginal) generator.   As explained by Plaintiffs, on September 3, 2013, "[a]s HE17 progressed, load increased and the re-priced units of GDF SUEZ became the marginal generator and were dispatched to generate electricity at their offer price of $4,900 . . . ."   FAC at ¶ 131.   Plaintiffs further elucidate GDF SUEZ's legitimate

motive by stating that each market participant who sold power in the real-time market during HE17 alone, "received an 'extra' $1,593.15 per megawatt." FAC at ¶ 139. GDF SUEZ's rational, economic motive was plainly to capture the highest price for its valuable generation capacity in times of scarce supply.[27] GDF SUEZ sought to achieve that goal through a bidding strategy that was not only lawful, but specifically approved by the PUCT. Plaintiffs do not dispute this fact. FAC at ¶ 17-21. By articulating a lawful and economically rational motive for GDF SUEZ's conduct, Plaintiffs undermine their attempt to plead scienter.

46.     Plaintiffs' attempts to establish an identifiable futures position fare no better. While Plaintiffs assert that Defendants' conduct "assures the value of its long positions on the commodities markets," it is not until seventy pages later that Plaintiffs identify even a hypothetical futures position that stood to benefit from Defendants' conduct. FAC at p. 3, ¶ 1 and ¶ 226. In the context of Plaintiffs' physical withholding allegations, they attempt to infer intent by arguing that "*[a]ssuming* GDF SUEZ sold just five contracts of the BalDay HB_NORTH futures contract . . . GDF SUEZ *could have* locked in a profit of $637,377." FAC at ¶ 226 (emphasis added). Plaintiffs' grasping only serves to highlight Plaintiffs' failure to plead a viable motive.

47.     Moreover, Plaintiffs' bare assertion that "GDF SUEZ trades in the forward markets, including ICE," is insufficient to plead scienter. FAC at ¶ 48. *See LIBOR III*, 2014 WL 2815645, at *11 (finding plaintiffs' allegation that defendants were motivated to manipulate Eurodollar futures contract prices because they held positions in the market insufficient to plead scienter under the CEA); *see also Silver*, 560 F. App'x. at 86 (agreeing that "an inference of intent cannot be drawn from the mere fact that JPMorgan had a strong short position"). As

---

[27] Plaintiffs own graphs confirm that other market participants in addition to GDF SUEZ were similarly following ERCOT's market design and bidding in their generation capacity at prices above their marginal cost and up to the system-wide offer cap. *See* FAC at ¶ 136.

Plaintiffs admit, "[t]he availability of ICE futures contracts allow market participants . . . to adjust and hedge their exposure to ERCOT market volatility."  FAC at ¶ 14.  Therefore, the fact that GDF SUEZ may be both a participant in the ERCOT physical market and the ICE futures market is not only permissible, but expressly contemplated by the design of the ERCOT market.

48.     In the absence of any concrete evidence of intent, Plaintiffs have resorted to the use of unreliable, libelous hearsay in order to attempt to raise a triable issue of fact.  Plaintiffs begin by asserting that "upon information and belief, GDF SUEZ sought the VMP . . . with the intention of manipulating prices in the commodities markets."  FAC at ¶ 21.  Plaintiffs then point the finger at GDF SUEZ's "outside consultants" who "upon information and belief . . . informed GDF SUEZ that it should cease its illegal, manipulative conduct."  FAC at ¶ 26.  Plaintiffs finally turn to a personal attack on Stefaan Sercu, alleging that "it has been reported to Plaintiffs that . . .[he commented] rhetorically 'did we move the forward markets.'"  FAC at ¶¶ 46, 273.  This last statement is perhaps the most egregious, because Plaintiffs go on to speculate as to Mr. Sercu's state of mind, arguing that his alleged statement "exhibit[ed] GDF SUEZ's intention to manipulate the commodities markets through its withholding scheme."  FAC at ¶ 46.  Plaintiffs' reliance on these uncorroborated statements to establish intent is unfounded, and their unsubstantiated personal attack on Mr. Sercu's character is reprehensible.

49.     The law regarding the admissibility of statements made by confidential witnesses at the motion to dismiss stage of the pleadings is well developed in the securities context.  Those standards are equally applicable here.  Courts have consistently referred to case law developed under the securities laws in deciding cases under the CEA.  *See Sherman v. Sokoloff*, 570 F. Supp. 1266, n.9 (S.D.N.Y. 1983).  Further, the CFTC has expressly stated its intention to be guided by the substantial body of judicial precedent applying analogous provisions of the

Securities Exchange Act.[28]   Regardless, even outside of the securities context, courts have consistently held that while "[a]llegations may be made on information and belief when the facts are peculiarly within the knowledge of the defendants, . . . it is axiomatic that the complaint must allege facts demonstrating the basis for the information and belief."   *MLSMK Invs. Co. v. JP Morgan Chase & Co.*, 737 F. Supp. 2d 137, 145 (S.D.N.Y. 2010) (addressing allegations defendants had committed fraud in violation of the federal RICO statute); *see also United States ex rel. Williams v. Bell Helicopter Textron Inc.*, 417 F.3d 450, 454 (5th Cir. 2005) (finding that while "fraud may be pled on information and belief . . . plaintiff still must set forth the factual basis for his belief").

50.     In securities fraud actions, as to each statement made on information and belief, "the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  Courts have interpreted this language to require confidential witnesses to be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information pleaded; complaint should give details such as the person's job description, individual responsibilities, and specific employment dates, and must allege with particularity when a comment was made to a confidential source, or, if the source alleges a conversation took place, when and where the conversation occurred." *In re ArthroCare Corp. Sec. Litig.*, No. A-08-CA-574-SS, 2010 WL 2901536, at *20 (W.D. Tex. July 20, 2010).  Plaintiffs have failed to provide the Court with any detail regarding their confidential sources or any corroborating evidence to impart a shred of reliability to the statements alleged.

---

[28] In promulgating the Final Rules, the CFTC expressly stated that "[g]iven the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b–5.  To account for the differences between the securities markets and the derivatives markets, the Commission will be guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b–5."  Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) (codified at 17 C.F.R. pt. 180) ("Final Rules"), Ex. 19.

51.     Even if Plaintiffs had met the minimum reliability standards, the Court would still not be bound to accept those statements as true.  The fact that the allegations "derive from confidential sources . . . detracts from their weight in the scienter analysis . . . . courts must discount allegations from confidential sources."  *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546, 552 (5th Cir. 2007) (finding that while confidential source statements are a permissible basis on which to make an inference of scienter, they must be accompanied by sufficient detail regarding the credibility of the source to be considered in ruling on a motion to dismiss); *Dawes v. Imperial Sugar Co.*, 975 F. Supp. 2d 666, 692-93 (S.D. Tex. 2013) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they do not even exist.")).  Outside of the Fifth Circuit, courts have conclusively stated that "[s]peculative statements from confidential witnesses are insufficient to establish scienter in securities fraud cases." *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal. 2012).

52.     The same logic should apply here, where Plaintiffs have lodged conclusory and unsubstantiated allegations supported by nothing more than anonymous, confidential witnesses. Without any corroborating evidence, it is at least possible that Plaintiffs may have misquoted their confidential sources or fabricated their existence altogether as "a gimmick for obtaining discovery costly to the defendants." *City of Livonia Emps.' Ret. Sys. and Local 295/Local 851 v. Boeing Co*., 711 F.3d 754, 759 (7th Cir. 2013) (refusing to give any weight to statements made by unidentified confidential sources).  Plaintiffs' allegations should similarly be given no weight

in determining whether they have adequately plead scienter.[29]

### b. Conscious Misbehavior or Recklessness

53. Courts confronted with the issue of scienter have held that even "[w]here motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Amaranth I*, 587 F. Supp. 2d at 529. Under this theory, "a plaintiff must allege facts showing that the defendant's conduct is at the least conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

54. Plaintiffs improperly attempt to meet this standard by equating knowledge with intent. Plaintiffs assert it is "common knowledge" that electricity prices in the ERCOT real-time market affect the price of related futures contracts traded on ICE. FAC at ¶ 41. Therefore because GDF SUEZ knows its conduct "will have [an] identified effect on the financial products traded on ICE," it must "intend[] that result." FAC at ¶ 45. Similar conclusory allegations are littered throughout the Complaint. *See, e.g.*, FAC at ¶¶ 47, 272, 280, 281. Courts have consistently held that "[m]ere knowledge of an effect is not enough to satisfy the intent requirement." *LIBOR III*, 2014 WL 2815645, at *14; *see also Hershey*, 610 F.3d at 249 ("Under a specific intent standard, mere knowledge is not enough"); *Amaranth I*, 587 F. Supp. 2d at 539 ("entering into a legitimate transaction knowing that it will distort the market is not manipulation–only intent, not knowledge, can transform a legitimate transaction into

---

[29] The press release attached as Ex. 1 to Plaintiffs' Complaint is irrelevant, inadmissible hearsay regarding the actions of a foreign affiliate (which is not a party to this litigation) in the wholesale market for electricity in Belgium. Even if the purported evidence did pertain to GDF SUEZ, it would be inadmissible under Federal Rule of Evidence 404 prohibiting the introduction of evidence regarding prior acts to prove the defendant acted in conformity with its prior behavior.

manipulation.").

55.     The *LIBOR III* court reasoned that such a requirement makes sense in the context of legitimate market activity because "when a defendant's conduct is potentially legitimate, a plaintiff should have a greater burden in demonstrating that the conduct was actually manipulative."   *LIBOR III*, 2014 WL 2815645, at *14.   Only where the alleged conduct is "unquestionably illegitimate" can knowledge of an impact on the market suffice to plead scienter.   *Id.*   Plaintiffs have admitted that GDF SUEZ's conduct is not only legitimate, but specifically authorized by the PUCT.   FAC at ¶ 17-21, 158.   Plaintiffs further admit that GDF SUEZ's conduct did not result in prices that are "unlawful, wrong or too high."   FAC at n.18. Knowledge of a potential effect on the ICE futures market is insufficient to plead scienter in the face of legitimate market activity.   Plaintiffs repeatedly argue that "anything that affects [ERCOT] LMPs will, by definition, affect the ICE settlement price."   FAC at ¶ 35.   If the Court were to accept Plaintiffs' logic and impute manipulative intent to any market participant with this "common knowledge," no ERCOT market participant could ever participate in futures markets without the risk of being accused of market manipulation by speculators who are unhappy with their returns in that market.[30]   FAC at ¶ 41.

### 3.     Allegations that GDF SUEZ Traded on Nonpublic Information Do Not Constitute a Violation of the CEA

56.     Despite Plaintiffs' assertion that their "claim is not based on GDF SUEZ's trading on private information," [FAC at n.19] Plaintiffs continue to suggest the possibility that GDF SUEZ traded on material, nonpublic information in a futile effort to turn GDF SUEZ's legitimate

---

[30] Further, as described more fully herein, the CEA specifically permits trading on lawfully obtained non-public information.   *See* Section E(4).   Plaintiffs' allegations that GDF SUEZ misrepresented its "intent to run" by submitting offers in the day-ahead market is contradicted by their own admission that transactions in the day-ahead market result in *financial commitments only*.   *See* FAC at ¶ 80.   Finally, Plaintiffs have failed to point to any law, PUCT Rule, or ERCOT Protocol that would make GDF SUEZ's use of the OFF or EMR status fraudulent, illegal, or illegitimate.   FAC at ¶ 158.   Failing to allege any unlawful conduct, GDF SUEZ's presumed knowledge of an effect on the futures market is insufficient to plead scienter.

market conduct into manipulation.  FAC at ¶¶ 48-49.  In arguing that GDF SUEZ "trad[ed] with inside, superior knowledge on commodities markets like ICE," Plaintiffs are asking this Court to impute disclosure obligations and a prohibition on insider trading that are foreign to the CEA.  In the securities context, Rule 10b-5 prohibits trading on the basis of material, nonpublic information.  *See, e.g.*, *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (explaining that "[t]rading on such information qualifies as a deceptive device under § 10(b) . . . because a relationship of trust and confidence exists between the shareholders of a corporation and the [corporate] insiders . . . . That relationship gives rise to a duty to disclose or to abstain from trading").  No such obligation exists under the CEA.  Congress specifically addressed the potential for uncertainty regarding disclosure obligations in the commodities context by enacting the portion of CEA Section 6(c)(1) that Plaintiffs conveniently omit from their pleading: "no rule or regulation promulgated by the Commission shall require any person to disclose to another person nonpublic information that may be material to the market price, rate, or level of the commodity transaction, except as necessary to make any statement made . . . in connection with the transaction not misleading in any material respect."  7 U.S.C. § 9(1); FAC at ¶ 267.  Plaintiffs do not allege GDF SUEZ made any statement within the meaning of this limited exception.

> 57.    The CFTC further addressed this issue in its Final Rules:

> To be clear, the Commission is not, by this rulemaking, imposing any new affirmative duties of inquiry, diligence, or disclosure.  Further it is not a violation of final Rule 180.1 to withhold information that a market participant lawfully possesses about market conditions. . . . The Commission recognizes that <u>unlike securities markets</u>, derivatives markets have long operated in a way that allows for market participants to trade on the basis of lawfully obtained material nonpublic information.

76 Fed. Reg. at 41,402-03 (emphasis added).  Plaintiffs' suggestion that Defendants improperly traded on inside information or failed to disclose material, nonpublic information to the market fails as a matter of law.

### 4. Plaintiffs Fail to Establish an Artificial Price Necessary to State a Claim under CEA Section 22(a)(1)(D)(ii)

58.     To properly allege a claim for market manipulation under Section 22(a)(1)(D)(ii), Plaintiffs must plead sufficient facts to establish that (1) the defendant possessed an ability to influence market prices, (2) an artificial price existed, (3) the defendant caused the artificial price, and (4) the defendant specifically intended to cause the artificial price. *Hershey*, 610 F.3d at 247.  As articulated by the Southern District of Texas, "[i]n order to state a manipulation claim, the plaintiffs must allege that defendants both intentionally acquired the ability to manipulate prices and exercised that ability to cause artificial prices." *In re Energy Transfer Partners*, 2009 WL 2633781, at *4 (citing *Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58–59 (5th Cir. 1962)).  Plaintiffs' simple recitation of the four elements, couched as claims, fails to meet even the liberal pleading standard under Rule 8.  Even if Plaintiffs had pled these elements with sufficient particularity Plaintiffs fail to state a claim upon which relief can be granted. Plaintiffs' Complaint fails as a matter of law because it is devoid of any allegations supporting the positions that an artificial price existed, that Defendants caused an artificial price, or that Defendants specifically intended to cause an artificial price.  In fact, Plaintiffs admit that ERCOT prices were not "unlawful, wrong or too high."  FAC at n.18.

59.     The Complaint fails as a matter of law with regard to the existence of an artificial price.  Plaintiffs allege that GDF SUEZ caused an artificial price by seeking a price above its marginal cost.  However, a supplier of a commodity cannot create an artificial price simply by demanding a price that is higher than its marginal cost.  Absent a corner, squeeze, or fictitious trade (none of which have been alleged by Plaintiffs), a supplier seeking the highest price possible cannot, as a matter of law, create artificial prices except where the alleged withholding violates the market rules in which the supplier is participating.  *Radley*, 659 F. Supp. 2d at 816.

According to the court in *U.S. v. Radley*, a withholding claim can only arise out of applicable market rules or other obligation to sell.  *Id.* ("Absent a contract obligation or statutorily imposed position restriction, neither of which was present in this case, a party is never required to sell or purchase anything.  To refuse to do so is not misleading or fraudulent, regardless of the motivation.").  As Plaintiffs admit, "in ERCOT, there are no rules requiring participants to engage in specific types of transactions."  FAC at ¶ 27.  Here, the PUCT exempted the conduct in question from any prohibition against withholding, and expressly held that GDF SUEZ, as a small fish, cannot exert ERCOT-wide market power.  *See* FAC at ¶¶ 17-21.

### 5.      Plaintiffs Fail to Establish Aider and Abettor Liability under the CEA

60.      A private right of action for aiding and abetting under the CEA requires a showing that the defendant aided and abetted the principal in committing one of the specifically enumerated violations of the CEA set forth in Section 22.  *In re Energy Transfer Partners*, 2009 WL 2633781, at *12 ("Under the CEA, to state a claim for aiding and abetting, the plaintiffs must allege that the defendants (1) had knowledge of the principal's intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective.").  Accordingly, a prerequisite to a claim for aiding and abetting a violation of the CEA is an underlying violation of the CEA.  Plaintiffs have failed to allege such a violation, Count II should be dismissed.  *See Silver*, 560 Fed. App'x at 87 (because "plaintiffs failed to allege a CEA violation, their aiding and abetting claim was properly dismissed").

61.      Furthermore, a private right of action for aiding and abetting under the CEA requires willful participation and a clear showing of a specific intent to violate the law. Plaintiffs' Complaint falls woefully short of that standard.  Section 22 of the CEA provides that an entity that "willfully aids, abets, counsels, induces, or procures the commission of a violation of [the CEA]" shall be liable to any person injured by the conduct for actual damages suffered.  7

U.S.C. § 25(a)(1).   Congress modeled the CEA's aiding and abetting provision on the federal statute that makes aiding and abetting a crime [18 U.S.C. § 2] and intended that it be interpreted consistently.[31]   Adhering to these standards, the Second Circuit in *Amaranth III* affirmed the granting of defendant's motion to dismiss because the routine clearing functions undertaken by the defendant failed to support an inference that it either knew of Amaranth's intent to manipulate the market or engaged in conduct with the specific intent to further that alleged goal. *Amaranth III*, 730 F.3d at 183-187.   The Fifth Circuit in *Amacker* similarly upheld the district court's decision to dismiss plaintiffs' complaint where defendants "did no more than execute regular trades requested by [the primary violator]."   *Amacker*, 657 F.3d at 257.   In reaching its conclusion, the Fifth Circuit noted that it had "often reiterated that, if the evidence show[ed] no more than transactions constituting the daily grist of the mill, it would be loathe to find aiding and abetting liability without clear proof of intent to violate the law."   *Id.* at 256.

62.   Plaintiffs admit that the Generator Defendants "do not have a will regarding their generation."   FAC at ¶ 282.   Plaintiffs' admission is fatal to their cause of action against the Generator Defendants. Without a will of their own regarding the offer or dispatch of the generation they are alleged to have economically and physically withheld from the market, the Generator Defendants cannot be found liable for aiding and abetting under the CEA.   *See Amacker*, 657 F.3d at 255–56 (requiring an intent to further the primary wrongdoer's CEA violation as an element of aider and abettor liability under the CEA).   Moreover, absent liability of the Generator Defendants, GSENA cannot be liable of aiding and abetting.

---

[31] *In re Amaranth Natural Gas Commodities Litig.*, 730 F.3d 170, 181 (2d. Cir. 2013) ("*Amaranth III*") (citing *Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987)).  The elements to establish aider and abettor liability under the CEA are "identical with those contemplated by the federal criminal aider and abettor statute. . . . [I]n order to state a claim . . . plaintiffs must allege that the defendant (1) had knowledge of the principal's intent to commit a violation of the [Commodity Exchange] Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective."   *Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252, 255–256 (5th Cir. 2011).

**VI.      CONCLUSION AND PRAYER FOR RELIEF**

63.      Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice and grant all other relief to which Defendants are entitled.

DATED:  August 8, 2014.

Respectfully submitted,

By:/s/ Stephen B. Crain

    Stephen B. Crain
    Attorney-In-Charge
    State Bar No. 04994580
    Federal Bar No. 12499
    Tony L. Visage
    State Bar No. 00788587
    Federal Bar No. 17248
    Amy E. Parker
    State Bar No. 24051156
    Federal Bar No. 626178
    J. Erick Sandlin
    State Bar No. 24056265
    Federal Bar No. 872070
    Leslie D. Wilson
    State Bar No. 24084109
    Federal Bar No. 1708460

    711 Louisiana Street, Suite 2300
    Houston, Texas 77002-2781
    (713) 223-2300 Telephone
    (713) 221-1212 Facsimile
    stephen.crain@bgllp.com
    tony.visage@bgllp.com
    amy.parker@bgllp.com
    erick.sandlin@bgllp.com
    leslie.wilson@bgllp.com

COUNSEL FOR DEFENDANTS GDF SUEZ
ENERGY NORTH AMERICA, INC.; ENNIS
POWER COMPANY, LLC; WISE COUNTY
POWER COMPANY, LLC; MIDLOTHIAN
ENERGY, LLC; HAYS ENERGY, LLC;
WHARTON COUNTY GENERATION, LLC;
AND COLETO POWER, LP

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 8, 2014, I electronically filed this motion and the associated Appendix with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record who have consented to electronic notification, including counsel for Plaintiffs, Barrington M. Hammond, Jr.


*/s/ Stephen B. Crain*
Stephen B. Crain