UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Aspire Commodities LP, Raiden Commodities, LP | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 4:14-cv-01111 |
| GDF-SUEZ Energy North America, Inc., Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO SUEZ'S REPLY BRIEF**

The Filed Rate doctrine does not apply to Plaintiffs' claims, either as a matter of theory or fact. Plaintiffs' complaint does not implicate the purposes of the doctrine to protect customers from rate discrimination and to prevent the courts from infringing the regulatory authority to set rates. Plaintiffs also do not allege harm from paying an approved rate, but from Suez's illegal manipulation of the swap prices on the InterContinental Exchange ("ICE"), a forward market, entirely independent from ERCOT. The Filed Rate doctrine has no application to such a claim, and Suez has not cited a single case finding it does.

Suez's repeated statements regarding its compliance with ERCOT's rules regarding Day Ahead Market offers and its changing offer curves continue to miss the point that Suez's compliance with ERCOT's rules does not insulate it from liability under 7 U.S.C. § 9(1).

Suez also inaccurately accuses Plaintiffs of misstating their burden under 7 U.S.C. § 9(3) to prove Suez specifically intended to manipulate the ICE market. In reality, *Suez* misstates

1

Plaintiffs' burden. They appear to argue that Plaintiffs must *prove* their case in the complaint. Plaintiffs must, of course, only identify facts making the existence of Suez's specific intent to manipulate the ICE markets more than a mere possibility, which Plaintiffs have done.

Suez's request for the Court to disregard material outside the pleadings ignores that Suez first improperly cited to such materials in their opening brief. Suez should not complain when Plaintiffs merely responded in kind.

## I. The Filed Rate Doctrine Does Not Apply.

The heart of the filed tariff doctrine is an anti-discrimination policy designed to protect customers, and that this policy "is violated when similarly situated customers pay different rates for the same services." *AT&T Co. v. Cent. Office Tel. Inc.,* 524 U.S. 214, 223 (1998); *see also City of Kirkwood v. Union Elec. Co.*, 671 F.2d 1173, 1179 (8th Cir.1982) (the Filed Rate doctrine is intended "to ensure uniformity of rates as between customers.") An ancillary interest of the doctrine is to preserve the regulating agency's authority to determine the reasonableness of rates. *Qwest Corp. v. Scott*, 380 F.3d 367, 375 (8th Cir. 2004). This case does not implicate either interest. Plaintiffs have not brought this action as a result of purchasing ERCOT electricity, direct or indirect, and their claim does not ask the Court to infringe upon ERCOT's right to set electricity rates.

In every one of Suez's cited cases the Filed Rate doctrine is applied to prevent a claim by a consumer of electricity or gas, bringing a claim in that capacity, as a purchaser of the commodity and challenging the price paid for the commodity. Here, Plaintiffs purchased and sold swaps, not ERCOT electricity, and Plaintiffs' claim is based on Suez's manipulation of the prices of those swaps. That claim does not ask the Court to set ERCOT rates and it does not implicate rate discrimination. Accordingly, Plaintiffs' claim has nothing to do with the interests

that justify the Filed Rate doctrine's existence and application. Suez has not cited a single analogous case, applying the Filed Rate doctrine to prevent a non-consumer's claim under the Commodities Exchange Act, and Plaintiffs have not found such a case. That is because the doctrine does not apply in such a context.

By contrast, the court in *In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880 (N.D. Ill. 2011), addressed and rejected application of the Filed Rate doctrine to facts analogous to those here. The court correctly recognized the difference between a claim brought by a consumer who paid a regulatory rate which the consumer claims is unreasonable or illegal and a claim brought by a non-consumer alleging harm from artificial prices for derivative commodities contracts due to illegal manipulation. The former is prohibited by the Filed Rate doctrine, the latter is not. *Id.* at 895-96.

In its Reply, Suez misstates the nature of Plaintiffs' claim in an attempt to make their Filed Rate doctrine argument appear relevant. Suez states that to avoid the Filed Rate doctrine Plaintiffs have changed the nature of their claim from one focusing on the ultimate settlement prices of the ICE swaps to one now centering on altered market expectations. (Reply at ¶ 6.) That statement is untrue in two ways: (1) Plaintiffs have not made arguments specifically to avoid the Filed Rate doctrine because, as noted above, that doctrine has no application to Plaintiffs' purchase of swaps on the ICE market; and (2) Plaintiffs have not changed the orientation of their claim. Plaintiffs' First Amended Complaint specifically and expressly alleges harm from market expectations that Suez intentionally and illegally manipulated.

At paragraphs 29-30 of their First Amended Complaint, Plaintiffs explain that ICE contract prices prior to final settlement are determined by market expectations:

> At any point in time the price at which [the referenced ICE contract] trades prior to settlement is simply the market's expectation regarding the actual value of

3

those average peak hourly prices. In other words, prior to settlement, commodities traders use known information about market conditions to form their own expectations as to what the final settlement price may be.

\*\*\*

[T]hat is not to say, however, that the futures contract price is mathematically determined [by ERCOT LMPs] prior to settlement; commodities traders in the market set the price of each futures trade based on their respective expectations as to the final clearing price. In a competitive market, i.e. one that, among other things, is not being manipulated, this transmission of information from the physical market (ERCOT) to the futures market (e.g. ICE) should lead to more efficient outcomes and is a positive characteristic. However, to the extent that prices and information in ERCOT are capable of being manipulated, then the futures prices will be similarly distorted.

\*\*\*

Since the price of the contract prior to expiration is simply the expectation of the settlement price, anything that affects this expectation will, again, by definition, affect the price at which the contract trades prior to expiration.

(FAC, ¶¶ 29-30, 35.)

Plaintiffs' First Amended Complaint also explains that their harm is not solely determined by the final ICE settlement price and sometimes that settlement price is entirely irrelevant to Plaintiffs' alleged harm. Contrary to Suez' characterization, Plaintiffs do not buy an ICE contract, sit idle on that contract and then allege harm relative to the final ICE settlement price. Rather, as Plaintiffs describe in their First Amended Complaint, they purchase ICE contracts based upon their expectations developed from multiple market information points, including the generation and offer prices disclosed in ERCOT's Day Ahead Market ("DAM"). Plaintiffs then make various trades and take different positions on ICE during the day, again based upon their expectations, developed from market information. Many times Plaintiffs' damages result entirely from the pre-settlement effects of market fluctuations caused by Suez's illegal manipulation. *See, e.g.* FAC, ¶¶ 75, 94, 119, 142.

4

Suez's statement that Plaintiffs allege harm solely by reference to the ultimate ICE settlement prices simply ignores the allegations of Plaintiffs' First Amended Complaint. Like the plaintiffs in *In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880 (N.D. Ill. 2011), Plaintiffs here allege harm in whole and in part resulting from Suez's manipulation of both the trading prices and the ultimate settlement prices of ICE swaps. *See id*. at 895-96 (rejecting the same argument made by Defendants, because "Plaintiffs' damages do not stem from Defendants' manipulation of the actual filed rate, or from the fact that they paid an unreasonable rate for milk, but from the fact that they paid an unreasonable amount for milk futures based on inflated expectations for what the filed rate would be.").

Accordingly, as the court found in *In re Dairy Farmers of Am. Inc. Cheese Antitrust Litig.*, Plaintiffs' damages may not be easy to prove, but determining them will not require the Court to engage in rate-making. Rather, Plaintiffs' damages will be determined by how much Suez succeeded in artificially altering market expectations. Therefore, Plaintiffs' claims are not barred by the Filed Rate doctrine.

## II. Suez's Compliance with ERCOT Rules Does Not Insulate It From Liability Under 7 U.S.C. § 9(1).

Section 9(1) of the CEA (i.e. 7 U.S.C. § 9(1)) proscribes fraud-based manipulations.[1] In its Reply, Suez repeats its unfounded position that it cannot be found liable under Section 9(1) because (1) the PUCT does not penalize them for generating less than its predicted generation in the DAM, (2) the PUCT allows them to economically withhold generation and (3) the PUCT allows them to physically withhold generation through improper exploitation of the EMR and OFF designations. *See* Reply at ¶¶ 9-11. But that argument, again, misses the point. Suez's

---

[1] For unknown reasons, Suez continues to cite to the applicable sections of the Congressional Bill, not the codified sections of the CEA.

5

compliance with PUCT's rules and practices is irrelevant to Plaintiffs' claims and irrelevant to Suez's violation of 7 U.S.C. § 9(1).

Suez's Reply does not attempt to address the court's decision in *U.S. v. Reliant Energy Services, Inc.*, 420 F. Supp. 2d 1043, 1068 (N.D. Cal. 2006), which expressly rejected compliance with regulatory rules as a defense to a claim for manipulation under the CEA. In that case the defendant, like Suez here, argued that its artificial withholding of supply could not be found to violate the CEA because its conduct was permitted by the applicable regulatory rules. The court rejected that position because a claim under the CEA is not based on breach of the applicable regulatory rules:

> [T]he fact that withholding of supply might have been permitted by the rules governing the California wholesale electricity market in 2000 does not require dismissal of [Plaintiff's claim for commodities price manipulation]. Whether the conduct alleged in the indictment, taken as a whole, violated those rules is a question the court need not resolve, because Suez do not stand accused of violating those rules; they are accused of manipulating the price of a commodity in interstate commerce in violation of 7 U.S.C. 13(a)(2).

*Id.* at 1068.

Here, as in *Reliant Energy Services*, Plaintiffs do not seek damages from Suez's violation of PUCT's rules. Rather, Plaintiffs pleaded specific facts plausibly demonstrating that Suez violated 7 U.S.C. § 9(1) and Rule 180.1(a)(1)-(4) by: (1) intentionally submitting materially false reports and statements to ERCOT's DAM regarding its expected production and pricing on days when Suez knew it would be withholding generation (either economically or physically), (2) intentionally making false or misleading statements regarding its units available for generation and, (3) intentionally creating false expectations regarding the value of electricity in ERCOT's Real Time Market, all with the intent to affect the prices of ICE contracts. Those specific, detailed factual allegations supporting Plaintiffs' claim under 7 U.S.C. § 9(1) are listed at page

18-21 of Plaintiffs' Opposition to Suez' Motion to Dismiss, which are incorporated here by reference.

Suez's Reply does not attempt to address or respond to Plaintiffs' specific factual allegations and Suez does not argue that Plaintiffs' factual allegations are insufficient under Rule 9(b). That is because Plaintiffs' allegations are sufficient and do state a cognizable claim under 7 U.S.C. § 9(1).

### III. Plaintiffs Accurately Described Their Burden Under 7 U.S.C. § 9(3) and the Standard for Meeting That Burden, Suez Did Not.

Defendants accuse Plaintiffs of misstating their burden under the non-fraud manipulation section of the CEA, 7 U.S.C. § 9(3). Defendants protest too much. The standards for proving the requisite specific intent are identical in both Plaintiffs' and Defendants' cited cases.

Plaintiffs cited to *In re Magnum Hunter Res. Corp. Sec. Litig.*, No. 13 Civ. 2668 (KBF), 2014 WL 2840152, at *10 (S.D.N.Y. June 23, 2014), for the proof needed to establish Defendants' specific intent, as required by Section 9(3). Plaintiffs quoted:

> An inference of specific intent can be established "either (a) by alleging facts to show the defendants had both motive and opportunity to commit fraud, or (2) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *9.

(Opposition at 30.)

In its Reply, Suez state that Plaintiffs' cited case "has no bearing on the proper standard to state a claim under Section [9(3)] of the CEA." (Reply at 8.) But Suez cited in both its Motion and its Reply to *In Re Libor-Based Financial Instruments Antitrust Litigation*, -- F. Supp. 2d --, No. 11 MD 2262(NRB), 2014 WL 2815645 (S.D.N.Y. June 23, 2014) ("LIBOR III"). That decision articulates *exactly the same standard* for proving specific intent under the CEA as articulated in Plaintiffs' cited case. The court in LIBOR III stated:

7

> To state a claim for manipulation under the CEA, a plaintiff must plead that Suez "specifically intended" to cause the artificiality that existed in the relevant market . . . This specific intent requirement, also known as scienter, "may be alleged generally," . . . though plaintiffs must still allege facts that "give rise to a *strong inference* of scienter[.]"
>
> Plaintiffs may plead scienter "either (a) by alleging facts to show that Suez had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."

*Id.* at *11 (emphasis original).

As Plaintiffs accurately stated, intent can be established by either alleging facts making it plausible that defendants had both motive and opportunity to commit fraud or by alleging circumstantial facts creating a strong inference of conscious misbehavior or recklessness. Defendants' cases agree.

Defendants, not Plaintiffs, misstate Plaintiffs' burden to state a claim under Section 9(3). Defendants appear to argue that Plaintiffs must *prove* Defendants' specific intent in their complaint, rather than merely alleging that intent. They incongruently argue "[p]leading motive requires proof of a 'concrete and personal benefit'" resulting from their manipulations. (Reply at 9.) Plaintiffs, however, are not required to offer their proof at this stage of the litigation. They are only required to identify facts making Defendants' manipulations plausible. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At pages 18-21 and 31 of their Opposition, Plaintiffs detail the facts alleged in their First Amended Complaint that satisfy that burden.

Regarding Suez's motive and opportunity to manipulate ICE prices, Plaintiffs do not rely on "vague allegations of purportedly uneconomic conduct" as Suez's charges. (Reply at 10.) Rather, Plaintiffs identify detailed facts regarding Suez's generation units that allow Plaintiffs to reasonably know Suez's marginal generation costs. Plaintiffs plead facts showing that Suez withheld generation, both economically and physically, when the LMP significantly exceeded

8

Suez's marginal generation costs and thus forewent the opportunity to make significant profits in the ERCOT market. Plaintiffs identify the specific hours of Suez's withholding and the megawatt hours of electricity it withheld. Plaintiffs identified the PUCT's general rule that a generator is likely withholding when it refuses to generate at prices significantly above its marginal costs. Plaintiffs demonstrate that Suez's withholding drove up the prices in both ERCOT and on ICE and thus presented Suez with unique opportunities for profit and hedging on ICE.[2] Plaintiffs demonstrate that even a small change in ICE prices provides Suez with profits sufficient to make up for the lost ERCOT profits. Plaintiffs allege that Suez forewent the ERCOT profits for the opportunity to obtain bigger profits on ICE through its illegal manipulations. *See* Opposition at 18-21 and the specific FAC paragraphs cited therein.

Plaintiffs have alleged specific facts plausibly demonstrating that Suez intended to manipulate the ICE market through its withholding schemes in ERCOT and therefore have met their burden. Plaintiffs' detailed allegations are not vague conclusions; they detail Defendants' motive and opportunity -- and thus their intent -- to manipulate the prices of ICE contracts, in violation of Section 9(3) of the CEA. The same facts -- together with Suez's admissions that ERCOT prices drive ICE prices -- establish Suez's consciousness of its actions. All of these facts alleged by Plaintiffs are more than sufficient to meet Plaintiffs' burden at the pleading stage to prove Defendants had both motive and opportunity to commit fraud, or strong circumstantial evidence of Defendants' conscious misbehavior or recklessness. *In re Magnum Hunter Res.*

---

[2] Just this week Potomac Economics, the Independent Market Monitor for ERCOT, confirmed that withholding by "small fish" can have large market effects (SOM at 106), and that in 2013 Suez stood apart from other generators by withholding generation when LMPs exceeded its marginal costs. (SOM at 115.) Potomac Economics also recognized that Suez's withholding succeeded in driving up LMPs an average of $1/MWh, *id.*, which, given the total MWh generated in ERCOT in 2013, means that Suez's withholding raised LMPs by an aggregate amount in excess of $240 million. *See* https://www.potomaceconomics.com/uploads/ercot_documents/2013_ERCOT_SOM_REPORT.pdf

*Corp. Sec. Litig.*, No. 13 Civ. 2668(KBF), 2014 WL 2840152 at *10; *LIBOR III*, --F. Supp. 2d --, No. 11 MD 2262(NRB), 2014 WL 2815645, at *11.

### IV. Suez Opened the Door to Referencing Material Outside the Pleadings and Thus Should Not Complain When Plaintiffs Responded in Kind.

Suez repeatedly cited to purported statements made by Plaintiffs' counsel to the media in support of its Motion to Dismiss. Those statements were outside the pleadings. When Plaintiffs responded to Suez's Motion with its own materials outside the pleadings, Suez cried foul. Suez cannot have it both ways. To the extent the Court considers either party's extra-pleading materials, Plaintiffs believe any reasonable interpretation of its submitted materials reveals that Suez subjectively knew the effect of its withholding in ERCOT on the forward markets such as ICE and intended that result, just as Plaintiffs have alleged.

### V. Conclusion.

For each and all of the above reasons, and for those in Plaintiffs' Opposition to Defendants' Motion to Dismiss, Plaintiffs request the Court to deny Suez's Motion to Dismiss.

Dated:  October 3, 2014

Respectfully submitted,

*/s/ Barrington M. Hammond, Jr.*
Barrington M. Hammond, Jr.
Texas Bar No. 24059883
Federal ID No. 1338567
4801 Woodway Drive
Suite 300 East
Houston, Texas 77056
Telephone:  (713) 570-6000
Fax:  (832) 514- 7046
Email: barry@patelhammond.com

Of Counsel:

T. Joseph Wendt
Indiana Bar No. 19622-49
Barnes & Thornburg LLP
11 S. Meridian
Indianapolis, IN 46204
Phone:  (317) 231-7748
Fax:  (317) 231-7422
Email:  jwendt@btlaw.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed electronically via the Court's ECF system on this 3rd day of October, 2014.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Barrington M. Hammond, Jr.*