IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ASPIRE COMMODITIES, LP and RAIDEN COMMODITIES, LP, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| GDF SUEZ ENERGY NORTH AMERICA, INC., ENNIS POWER COMPANY, LLC, WISE COUNTY POWER COMPANY, LLC, MIDLOTHIAN ENERGY, LLC, HAYS ENERGY, LLC, WHARTON COUNTY GENERATION, LLC, and COLETO CREEK POWER, LP, | § § § § § § § § | CIVIL ACTION NO. H-14-1111 |
| Defendants. | § | |

MEMORANDUM AND ORDER

Pending is Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Document No. 15). After having carefully considered the motion, response, reply, sur-reply, and applicable law, the Court concludes for the reasons that follow that the motion should be granted.

## I.   Background

This case is premised on allegations of manipulative behavior among generators of electricity within Texas's energy market, which is operated by the Electric Reliability Council of Texas ("ERCOT").[1] Defendant GDF SUEZ Energy North America, Inc. ("GDF")

---

[1] Document No. 10 at 2 (1st Am. Compl.)

allegedly controls the generation of electricity within ERCOT of the other named Defendants, which operate generators to produce electricity.[2]   Plaintiffs Aspire Commodities, LP ("Aspire") and Raiden Commodities, LP ("Raiden," and together with Aspire, "Plaintiffs") are traders which allege that they have been harmed by Defendants' manipulation of prices in the derivative commodities markets.[3]

ERCOT operates two separate markets: a Real-Time Market for the physical sale of electricity, and a Day-Ahead Market, which is a forward market anticipating the physical sales of the following day.[4]   ERCOT also allows "virtual trades," where participants trade on differences between the Day-Ahead Market and the Real-Time Market.[5]   Plaintiffs allege that "one commonly used measure for how well the wholesale market is working is the degree of price convergence between the Day Ahead and Real Time markets."[6]

ERCOT balances the real time supply with the demand for electricity by adjusting the market price, called the Locational

---

[2] _Id._ ¶ 3.   These Defendants are Ennis Power Company, LLC, Wise County Power Company, LLC, Midlothian Energy, LLC, Hays Energy, LLC, Wharton County Generation, LLC, and Coleto Creek Power, LP.  _Id._

[3] _See id._ at 1-2.

[4] _Id._ ¶ 4.

[5] _Id._ ¶ 15.

[6] _Id._ ¶ 5.

Marginal Price ("LMP") to incentivize more or less energy production as needed.[7]   Generators like Defendants offer electricity to ERCOT in price/quantity pairings of their choosing, known as offer curves, which ERCOT uses to balance the system by using the next lowest-cost energy to serve the next unit of demanded energy.[8]   Generators can change their offer curves throughout the day but must supply an offer curve at least one hour in advance.[9]   A generator can effectively prevent dispatch of its energy by offering it to ERCOT at prices above the LMP, but if that generator's energy is needed, ERCOT will raise the LMP to attract and capture the needed energy.[10]

ERCOT's primary regulator is the Public Utility Commission of Texas ("PUCT").[11]   The PUCT prohibits the withholding of energy by a generator that has "market power," but provides that "[a] single generation entity that controls less than 5% of the installed generation capacity in ERCOT . . . is deemed not to have ERCOT-wide market power."[12]   GDF controls just under five percent of the market

---

[7] Id. ¶ 7.

[8] Id. ¶ 9.

[9] Id.

[10] Id. ¶ 11.

[11] Id. ¶ 2.

[12] Document No. 10 ¶¶ 16-17; P.U.C. Subst. R.25.504(c) (found at Document No. 16, ex. 18).

share in Texas, and in March 2013 entered into a Settlement Agreement and Voluntary Mitigation Plan (VMP) with the PUCT, in which the PUCT agreed that by adherence to the VMP, GDF has "an absolute defense against an allegation pursuant to [Texas law and the PUCT's regulations] of an abuse of market power through economic withholding."[13]   Plaintiffs allege that the PUCT's rule that generators controlling less than five percent of generation capacity within ERCOT do not have ERCOT-wide market power "is simply wrong" because it ignores the actual ability of GDF to generate artificially high market prices though intentional withholding in times of tight supply.[14]   In April 2014, Plaintiff Raiden petitioned the PUCT to eliminate the five percent rule, which petition the PUCT denied.[15]

The day after Raiden petitioned the PUCT for the rule change, Plaintiffs filed this suit, alleging that GDF has manipulated the market by intentionally withholding electricity generation during times of tight supply, in order to drive up prices in the Real-Time Market and to manipulate contract prices in the derivative commodities market, in violation of the federal Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*[16]   Plaintiffs' very lengthy First Amended

---

[13] Document No. 16, ex. 21 at 4 of 15, 8 of 15.

[14] Document No. 10 ¶¶ 17-18, 22-25.

[15] Document No. 16, ex. 23.

[16] Document No. 1; Document No. 10 at 1-2.

Complaint alleges numerous instances in which GDF engaged in "economic withholding" by suddenly increasing its offer prices from their normal rates[17] to almost $5,000 per MWh--which is ERCOT's maximum allowable LMP--for one or two hours at peak demand times and then offering lower prices, causing ERCOT at first to purchase less electricity from Defendants, driving up the LMP, and creating major variances between the Day-Ahead and Real-Time markets.[18] Plaintiffs also allege that Defendants engaged in "physical withholding" by unnecessarily designating as offline and/or available only for emergencies various generation units owned by the generator Defendants.[19]

Plaintiffs allege that commodities traders in secondary futures markets, such as the InterContinental Exchange ("ICE"), depend on either the actual ERCOT prices or the expected ERCOT prices, such that any action or information that affects the LMPs in ERCOT will have an effect on futures prices.[20] Plaintiffs allege that GDF trades in the secondary futures markets, including on ICE, and that because of its ability to withhold energy at critical

---

[17] It is difficult to discern from the pleadings the typical range of LMP values, but it appears from some of Plaintiffs' charts and graphs that when demand is not unusually high, the LMP is under $100 per MWh, and even in periods of peak demand it typically stays below $1,000 per MWh. *See, e.g.*, Document No. 10 ¶ 101.

[18] *See* id. ¶¶ 56-142.

[19] Id. ¶¶ 148-264.

[20] Id. ¶ 30.

times and drive up prices, GDF "has superior, material, non-public knowledge on which to base its trades."[21]   Accordingly, Plaintiffs allege that during times of tight supply when GDF stands to benefit from selling--not withholding--its electricity production, GDF "is willing to forego the profit it can make selling energy in the ERCOT market at prices above its marginal costs . . . because it can make more elsewhere - namely, by trading with inside, superior knowledge on commodities markets like ICE."[22]

Plaintiffs allege that GDF's "manipulation of prices in the commodities markets, through its actions within ERCOT," has created artificial and unpredictable prices on ICE, causing Aspire to lose substantial sums--including lost profits--in its trades on ICE, and causing Raiden damages from its trades on ERCOT's virtual markets.[23] Plaintiffs allege that GDF violated the Commodity Exchange Act ("CEA"), and that all Defendants conspired to violate and aided and abetted in the violation of the CEA.[24]   Plaintiffs also seek a declaratory judgment and a permanent injunction prohibiting GDF from economically and physically withholding its generation.[25]

---

[21] Id. ¶ 48.

[22] Id. ¶ 49.

[23] Id. ¶¶ 54, 276.

[24] Id. ¶¶ 266-84.

[25] Id. ¶¶ 285-94.

Defendants move to dismiss Plaintiffs' First Amended Complaint, arguing that (1) no private right of action is available to Plaintiffs under the CEA, (2) Plaintiffs lack standing, (3) the "filed rate doctrine" bars Plaintiffs' claims, (4) Plaintiffs fail to meet the "interstate commerce" jurisdictional requirement of the CEA, and (5) Plaintiffs fail to state a claim under the CEA.[26]

## II.   Legal Standard

Defendants move to dismiss Plaintiffs' First Amended Complaint under both Rule 12(b)(1) and Rule 12(b)(6).[27]  Under Rule 12(b)(1), Defendants challenge Plaintiffs' standing, arguing that Plaintiffs' claim under the CEA is barred by the Commodity Futures Trading Commission's ("CFTC") exemption of the transactions in question from the CEA and that the CEA bars claims for injunctive and declaratory relief.[28]  These arguments challenge the existence of a federal cause of action, and accordingly, Defendants' motion is properly considered as an attack on the merits under Rule 12(b)(6). Williamson v. Tucker, 645 F.2d 404, 415 (5th Cir. 1981) ("Where the defendant's challenge to the court's jurisdiction is also a challenge to the existence of a federal cause of action, the proper course of action for the district court (assuming that the

---

[26] Document No. 15.

[27] Id.

[28] See id. at 8-15.

plaintiff's federal claim is not immaterial and made solely for the purpose of obtaining federal jurisdiction and is not insubstantial and frivolous) is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case.").[29]

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  When a district court reviews the sufficiency of a complaint before it receives any evidence either by affidavit or admission, its task is inevitably a limited one.  *See* Scheuer v. Rhodes, 94 S. Ct. 1683, 1686 (1974), *abrogated on other grounds by* Harlow v. Fitzgerald, 102 S. Ct. 2727 (1982).  The issue is not whether the plaintiff ultimately will prevail, but whether the plaintiff is entitled to offer evidence to support the claims.  Id.

In considering a motion to dismiss under Rule 12(b)(6), the district court must construe the allegations in the complaint favorably to the pleader and must accept as true all well-pleaded facts in the complaint.  *See* Lowrey v. Tex. A&M Univ. Sys.,

---

[29] The Fifth Circuit has explained that "[t]he basic reason for this rule is obvious.  If federal jurisdiction turned on the *success* of a plaintiff's federal cause of action, no such case could ever be dismissed on the merits." Eubanks v. McCotter, 802 F.2d 790, 793 (5th Cir. 1986) (emphasis in original) (reversing district court's dismissal for lack of subject matter jurisdiction and remanding for decision on the merits where federal jurisdiction was intertwined with federal cause of action).

117 F.3d 242, 247 (5th Cir. 1997).   To survive dismissal, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009).   While a complaint "does not need detailed factual allegations . . . [the] allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 127 S. Ct. at 1964-65 (citations and internal footnote omitted).

## III.   Discussion

Defendants' principal argument is that the private right of action under the CEA is unavailable to Plaintiffs because all of Defendants' challenged actions took place in the ERCOT market.[30]

---

[30] Document No. 15 at 8-13.

Plaintiffs allege that GDF violated the CEA's prohibitions on manipulation, found at 7 U.S.C. § 9(1) and (3).[31]   Section 9(1)[32] provides, in relevant part:

> It shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the [CFTC] shall promulgate . . . .

7 U.S.C. § 9(1).   Section 9(3) provides that "[i]n addition to the prohibition in paragraph (1), it shall be unlawful for any person, directly or indirectly, to manipulate or attempt to manipulate the price of any swap, or of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity."   7 U.S.C. § 9(3).   The CFTC is charged with primary enforcement of these provisions and has promulgated rules

---

[31] Plaintiffs' First Amended Complaint also alleged a violation of 7 U.S.C. § 9(2), but Plaintiffs affirmatively abandoned this claim.   *See* Document No. 17 at 10 n.4 ("Plaintiffs withdraw their claim under 7 U.S.C. § 9(2).").

[32] The CEA sections do not always correspond to the U.S. Code sections, such that, for example, Section 6(c) of the CEA is found at 7 U.S.C. § 9, and 7 U.S.C. § 6(c) is the codification of Section 4(c) of the CEA.   To avoid confusion, this Memorandum refers to the U.S. Code provisions, unless otherwise noted.

interpreting them.[33]   The CEA also provides for a private cause of
action for those who have suffered actual damages as a result of

---

[33] Rule 180.1(a) provides, in relevant part:

It shall be unlawful for any person, directly or
indirectly, in connection with any swap, or contract of
sale of any commodity in interstate commerce, or contract
for future delivery on or subject to the rules of any
registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any
manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading
statement of a material fact or to omit to state a
material fact necessary in order to make the statements
made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice,
or course of business, which operates or would operate as
a fraud or deceit upon any person . . . .

17 C.F.R. § 180.1(a) (2014).  Rule 180.2 provides: "It shall be
unlawful for any person, directly or indirectly, to manipulate or
attempt to manipulate the price of any swap, or of any commodity in
interstate commerce, or for future delivery on or subject to the
rules of any registered entity."  17 C.F.R. § 180.2 (2014).  *See
also* Prohibition on the Employment, or Attempted Employment, of
Manipulative and Deceptive Devices and Prohibition on Price
Manipulation, 76 Fed. Reg. 41398 (explaining CFTC's decision to
promulgate Rules 180.1 and 180.2).

these violations.[34]  Plaintiffs' CEA claim relies on this private right of action.[35]

In conferring upon the CFTC responsibility to regulate futures trading, Congress also authorized the CFTC to "exempt any agreement, contract, or transaction (or class thereof) [in connection with futures trading] either unconditionally or on stated terms or conditions or for stated periods and either retroactively or prospectively, or both, from [any provision of the CEA]." 7 U.S.C. § 6(c)(1).  The statute further provides that if the CFTC determines that the exemption would be consistent with the public interest and the purposes of this chapter, it "shall . . . exempt from the requirements of this chapter an agreement, contract, or transaction that is entered into . . . (B) pursuant to a tariff or rate schedule establishing rates or charges for, or

---

[34] *See* 7 U.S.C.A. § 25(a)(1) ("Any person . . . who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person . . . (D) who purchased or sold a contract [for sale of any commodity for future delivery] or swap if the violation constitutes--(i) the use or employment of, or an attempt to use or employ, in connection with a swap, or a contract of sale of a commodity, in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative device or contrivance in contravention of such rules and regulations as the Commission shall promulgate . . . ; or (ii) a manipulation of the price of any such contract or swap or the price of the commodity underlying such contract or swap.").

[35] Document No. 10 ¶ 270.

12

protocols governing, the sale of electric energy approved or permitted to take effect by [state electricity regulators]." Id. § 6(c)(6).

The PUCT and the regulators of the other major regional electricity markets petitioned the CFTC to exempt from the CEA certain contracts, agreements, and transactions for the purchase or sale of electricity in their markets, in accordance with this provision. After a period of notice and comment, the CFTC on April 2, 2013 issued a Final Order generally exempting certain transactions in the energy market from the provisions of the CEA and CFTA regulations. See 78 Fed. Reg. 19880 (the "Final Order").

The Final Order provides that the CFTC exempts certain transactions

> from all provisions of the CEA, except . . . the [CFTC's] general anti-fraud and anti-manipulation authority, and scienter-based prohibitions, under CEA sections 2(a)(1)(B), 4(d), 4b, 4c(b), 4o, 4s(h)(1)(A), 4s(h)(4)(A), 6(c), 6(d), 6(e), 6c, 6d, 8, 9, and 13[36] and any implementing regulations promulgated under these sections including, but not limited to, Commission regulations 23.410(a) and (b), 32.4, and part 180.

Id. at 19912. The exempted transactions include "energy transactions," which are defined as transactions in a day-ahead or real time market for the purchase or sale of electricity, such as

---

[36] The foregoing CEA sections are codified at 7 U.S.C. §§ 2(a)(1)(B), 6(d), 6b, 6c(b), 6o, 6s(h)(1)(A), 6s(h)(4)(A), 9, 13b, 9a, 13a-1, 13a-2, 12, 13, and 13c, respectively.

the transactions at issue in this case, and the parties to the contract must be persons who "actively participate[] in the generation, transmission, or distribution of electric energy," such as GDF. *See* <u>id.</u> at 19913.   Furthermore, in the case of transactions on ERCOT, the agreement, contract or transaction must be offered or sold pursuant to a tariff, rate schedule, or protocol approved or permitted by the PUCT, as were the transactions in this case. <u>Id.</u> at 19913-14.

Plaintiffs in their CEA claim allege that through its withholding schemes, GDF "intentionally, knowingly, and recklessly manipulated, and continues to manipulate, the price of electricity in the ERCOT market and has caused the prices in ERCOT's Real Time market to increase artificially," with the intent to manipulate futures contracts on ICE.[37] However, as Defendants correctly argue, GDF's transactions within ERCOT are exempted transactions under the Final Order.[38] As observed above, the exempted transactions include "energy transactions," which are defined as transactions in a day-ahead or real time market for the purchase or sale of electricity, such as the transactions in this case.   The Final Order exempts these transactions "from all provisions of the CEA," which includes 7 U.S.C. § 25 upon which Plaintiffs rely as the basis for their private cause of action.   Moreover, § 7 U.S.C. § 25--which is

---

[37] Document No. 10 ¶¶ 271-72.

[38] *See* Document No. 15 at 8-9.

Section 22 of the CEA--is not included in the Final Order's listing of CEA sections retained as part of the CFTC's general anti-fraud and anti-manipulation authority and scienter-based prohibitions.

Plaintiffs respond that the Final Order does not preclude their CEA claim because it does not apply to transactions in the ICE market, which transactions Plaintiffs maintain "were the object of [GDF's] manipulations and . . . the subject of Plaintiffs' First Amended Complaint."[39]   However, even assuming *arguendo* that GDF intended to influence the ICE market, all of the conduct that Plaintiffs challenge took place entirely within the ERCOT market, as Plaintiffs' pleadings make clear.[40]   Indeed, although Plaintiffs' 95-pages First Amended Complaint details numerous transactions within ERCOT, it does not identify a single ICE transaction in which GDF or any other Defendant engaged.   Because GDF's allegedly improper conduct consisted solely of transactions within ERCOT that are covered by the CFTC's Final Order and thus are exempted from the CEA, the private right of action in 7 U.S.C. § 25 of the CEA is unavailable to Plaintiffs, and their cause of action under the CEA is dismissed.

---

[39] Document No. 17 at 14-15.  *See also* Document No. 10 at 87 n.17 (alleging that the Final Order does not apply to Plaintiffs' claim because it does not apply to ICE transactions).

[40] *See* Document No. 10 at 88 n.18 ("Plaintiffs' claim is based on [GDF's] manipulation of the ICE contracts *through its manipulation of LMPs within ERCOT*.") (emphasis added).

Plaintiffs' causes of action for conspiracy and aiding and abetting and for declaratory judgment and permanent injunction are premised on a valid claim against GDF under the CEA.   Because Plaintiffs' CEA claim is barred by the CFTC's Final Order, their remaining claims are likewise dismissed.

Plaintiffs' first Complaint was 23 pages in length and, after Defendants moved to dismiss it for failure to state a claim, Plaintiffs filed a 95-pages long First Amended Complaint setting out in great detail their allegations of Defendants' conduct. Plaintiffs have not sought leave to replead and, in view of the length and exquisite detail included in Plaintiffs' First Amended Complaint, there is no reason to believe that Plaintiffs could file a more detailed pleading alleging claims that would not be precluded by the CFTC's Final Order.   Allowing Plaintiffs to replead would therefore be futile, and Defendants should not be put to the burden of filing a third motion to dismiss.   *See* <u>Foman v. Davis</u>, 83 S. Ct. 227, 230 (1962) (listing "futility of amendment" as a reason to deny leave to amend).

IV.   <u>Order</u>

For the foregoing reasons, it is

ORDERED that Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint (Document No. 15) is GRANTED and Plaintiffs Aspire Commodities LP and Raiden Commodities, LP's claims are

16

DISMISSED WITH PREJUDICE for failure to state a claim upon which relief can be granted.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 3rd day of February, 2015.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

17